[No. A049438. First Dist., Div. Four. Oct. 28, 1992.]

MILTON CHATTON et al., Plaintiffs and Respondents, v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PA., Defendant and Appellant.

COUNSEL

Pettit & Martin, D. Wayne Jeffries, Saul D. Bercovitch, Stroock, Stroock & Lavan, Michael F. Perlis, Robinson & Wood, Archie S. Robinson, Thomas R. Fellows, Horvitz & Levy, Ellis J. Horvitz and Peter Abrahams for Defendant and Appellant.

Cotcheet, Illston & Pitre, Joseph W. Cotchett, Marie Seth Weiner, Remcho, Johansen & Purcell, Joseph Remcho, Robin B. Johansen, Morgan, Ruby, Schofield, Franich & Fredkin, Allen J. Ruby, Lexie D. Schroeder and Thomas T. Anderson for Plaintiffs and Respondents.

OPINION

ANDERSON, P. J.—This is an appeal from a judgment declaring the rights and obligations of the parties under comprehensive general liability (CGL) and commercial liability umbrella (Umbrella) policies.

## I. FACTS

### A. *Background of Technical Equities Litigation*

The present lawsuit is a part of the Technical Equities Litigation, a coordination proceeding (hereafter Technical Equities) (Super. Ct. Santa Clara County, No. 600306; Coordination Master File No. 1991). Plaintiffs Milton and Mildred Chatton (hereafter Chattons or respondents) were investors in Technical Equities, now a defunct corporation. From its inception in 1969, Technical Equities was a diversified investment services company offering its clients both an array of investment options (promissory notes, stocks, limited partnerships and debentures) and a variety of financial ser-

vices (tax planning, accounting preparation and business management). After its collapse on February 7, 1986, the victims brought hundreds of individual actions against the Technical Equities directors and officers, among others, for fraud, negligent misrepresentation, breach of fiduciary duty and negligence. In March of 1986, the individual suits were coordinated in order to try issues of fact and law common to over 1,000 plaintiffs and scores of defendants. In early 1988 summary judgment was granted in favor of four directors and officers and denied as to others. Thereafter, the coordination judge set seven investor suits as a test case for trial.

Six of the defendants in the test case were Technical Equities directors and officers (including Herbert Barovsky and Harry Stern) while the seventh defendant was Stern Management Associates, a general partnership. Following a three- and-one-half-month trial, all seven defendants were found liable for negligent wrongdoing. In addition, defendants Harry Stern, Herbert Barovsky and Stern Management Associates were held liable to the test case plaintiffs for fraud. Plaintiffs were awarded the full amount of their investment losses and recovered damages for infliction of emotional distress as well. Punitive damages in the sum of $147 million were assessed for fraud against Stern, Barovsky, and Stern Management Associates. On September 12, 1988, the trial court entered judgments against the Technical Equities directors and officers in favor of all plaintiffs, including the Chattons.

Defendant National Union Fire Insurance Company of Pittsburgh, Pa. (hereafter National Union or appellant) was the primary insurance carrier for Technical Equities, having issued to the company and its officers and directors the CGL, Umbrella and directors and officers liability (D&O) policies. From the inception of the investors' litigation, National Union took the position that coverage under the D&O policy was available only for one year and the policy was self-consuming (i.e., the defense costs would be deducted from the available limits). This interpretation of the D&O policy was challenged by plaintiffs, who filed a test case for declaratory relief in November 1986 seeking an adjudication of coverage under the D&O policy. (Helfand v. National Union Fire Ins. Co., Super. Ct. Santa Clara County, 1986, Nos. 615589, 654728*.) Following trial, the court held that the D&O policy was not self-consuming and that coverage was available to plaintiffs for three policy years for the total of $30 million.

## B. *Facts of the Present Case*

The case herein was the second declaratory relief action and sought an adjudication of coverage under the CGL and Umbrella policies. This declaratory relief complaint was filed by respondents on August 15, 1989, and

*Reporter's Note: See *Helfand* v. *National Union Fire Ins. Co.*, *post*, page 869 for opinion on appeal.

contained the following allegations: National Union issued a CGL policy to Technical Equities and its subsidiaries providing coverage of $1 million per occurrence for the policy period of October 1, 1985, to October 1, 1986; National Union also issued to the insured an Umbrella policy providing excess liability coverage of $1 million per occurrence for the same policy period; on July 10, 1987, respondents filed a lawsuit against Technical Equities for, inter alia, negligent misrepresentation and breach of fiduciary duty; their action was coordinated with the numerous actions filed by other investors; that although the CGL and Umbrella policies issued to Technical Equities provided coverage for personal injury, bodily injury and advertising injury liability, National Union refused to pay judgments or settlements under either of the policies. In their prayer, respondents sought (1) a judicial declaration that both the CGL and Umbrella policies provided coverage for personal injury, bodily injury and advertising injury liability; (2) a judicial declaration that the wrongful acts committed by the insureds were "occurrences" within the meaning of said policies; (3) a determination as to the total amount of coverage available under both the CGL and Umbrella policies; and (4) an award of attorney fees.

Following trial the court held (1) that there is coverage under the bodily injury clause of the CGL policy inasmuch as emotional distress is included in the definition of bodily injury and (2) that respondent Mildred Chatton suffered severe emotional distress as a result of the activities of the Technical Equities officers and directors. The court determined that the limit recoverable under the CGL is $1 million per occurrence with no limit on the aggregate number of occurrences. The court further declared that advertising injury stemming from unfair competition as defined in the Unfair Business Practices Act (Bus. & Prof. Code,[1] § 17200 et seq.) is also covered by the CGL policy; that the aggregate policy limit for advertising injury is $1 million; and that Ms. Chatton suffered no advertising injury during the policy period at issue. Implicitly, the trial court also found that the wrongful activities of Technical Equities (security manipulations, note fraud, etc.) were "occurrences" within the meaning of the CGL policy.

The Umbrella policy, according to the court, covers personal injury and advertising injury. Personal injury is defined as meaning mental anguish and mental injury. Advertising liability means liability for damages because of unfair competition. The policy limit is $1 million for each occurrence of personal injury or advertising injury. However, the coverage under the Umbrella policy applies only to claims that are in excess of the amounts recovered under other insurance policies, including the CGL. The court

---

[1] Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

found that respondents did not incur damages in excess of coverage provided by other insurance policies. Upon a separate motion to tax costs the court awarded respondents attorney fees in the amount of $12,500.

The declaratory judgments rendered in Helfand and the present case have far-reaching implications. They served as foundations for two bad faith actions against National Union by over five hundred Technical Equities investors, the victims of its fraud and misdealing. In the first bad faith suit, McLaughlin et al. v. National Union (Super. Ct. Santa Clara County, 1991, No. 666839), judgment was entered against National Union for $48,943,165.45 of which $43 million represented punitive damages. In the second bad faith action, Abelson v. National Union et al. (Super. Ct. Santa Clara County, 1991, No. 666840), the judgment rendered against National Union was in the amount of $120,500,181. The combined judgments against National Union thus amounted to $169,443,346.45.

## II. Discussion

National Union's primary contention on appeal is that the trial court erred in finding that respondents' claim was covered by: (A) the bodily injury clause and/or (B) the advertising injury liability provisions of the CGL policy. In addition, National Union argues (C) that the award of attorney fees for respondents was improper because the trial court's finding of unfair dealing, a tort, was based on erroneously admitted evidence. Appellant's contentions are discussed seriatim.

### A. Coverage Under the Bodily Injury Clause of the CGL Policy

In the definition of the CGL policy, "bodily injury" means: "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom; . . . ." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured; . . . ." Property damage under the policy means "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period; . . . ."

The trial court held that respondents who had suffered severe investment losses due to the insureds' stock manipulation and note fraud could recover under the bodily injury clause of the CGL policy because emotional injuries

standing alone constituted bodily injury and that the wrongful activities of the Technical Equities directors and officers were "occurrences" within the meaning of the policy.

National Union contends that the holding of the trial court is erroneous because: (1) emotional distress, without accompanying physical injury, does not constitute bodily injury as defined in the CGL policy; (2) the bodily injury coverage of the CGL does not cover claims for emotional distress caused by investment losses; and (3) the wrongful activities of Technical Equities, the insured, were not "occurrences" within the meaning of the policy. Appellant's points are well taken.

(1) *Emotional Distress Without Physical Injury Does Not Constitute "Bodily Injury" Within the Meaning of the CGL policy*

 Relying primarily on *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 928 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] and *Abellon* v. *Hartford Ins. Co.* (1985) 167 Cal.App.3d 21, 26 [212 Cal.Rptr. 852], the trial court held that "Emotional Distress is included in the [CGL] policy definition of bodily injury." National Union contends that the trial court's interpretation of the phrase "bodily injury, sickness or disease" is overly broad and contrary to the overwhelming weight of case authority both in California and elsewhere. We agree.

The rules relating to the interpretation of insurance contracts are well settled. As frequently emphasized, words used in an insurance policy are to be interpreted in their ordinary sense, i.e., according to the plain meaning which a layperson would ordinarily attach to them. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [226 Cal.Rptr. 558, 718 P.2d 920].) If the meaning a layperson would ascribe to the contract language is not ambiguous, there is no place for interpretation and the court must simply apply that meaning. (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) If there is ambiguity in the policy, it is resolved by interpreting the ambiguous provisions in the sense the promisor (the insurer) believed the promisee (the insured) understood them at the time of formation. If the application of this rule does not eliminate the ambiguity, the ambiguous language is construed against the party who caused the uncertainty to exist, i.e., the insurer. (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co., supra,* at p. 912.) It is emphasized, however, that the courts will not adopt a strained or absurd interpretation to find an ambiguity where none exists. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].)

The bodily injury clause in the CGL policy has been interpreted on numerous occasions. The cases overwhelmingly hold that the phrase "bodily injury, sickness or disease" is plain and unambiguous and that coverage under the bodily injury clause is limited to physical injury to the body and does not include nonphysical, emotional or mental harm.

In giving meaning to the term "bodily" as laypersons commonly understand it, the case law draws on both the dictionary definition of the word and the general principles of law relating to the interpretation of insurance contracts. "Bodily" under dictionary definition is equated with "physical, corporeal" as opposed to "mental or spiritual." For example, Webster defines "bodily" as "having a body or a material form: physical, corporeal . . . . [¶] . . . Bodily contrasts with *mental* or *spiritual*." (Webster's New Internat. Dict. (3d ed. 1981) p. 245, italics in original; see also Webster's New Collegiate Dict. (9th ed. 1984) p. 164.) The American Heritage Dictionary (2d College ed. 1982) describes "bodily" as "*adj.* 1. Of, pertaining to, within, or exhibited by the body; *bodily organs.* 2. Physical as opposed to mental or spiritual; *bodily welfare adv.* 1. In the flesh; in person; *bodily but not mentally present.*" (At p. 193, italics in original.) The Random House Dictionary of the English Language (2d ed. 1987) defines "bodily" as "1. of, or pertaining to, the body; 2. corporeal or material as contrasted with spiritual or mental." (At p. 232.) Similarly, Black's Law Dictionary (6th ed. 1990) defines "bodily" as "Pertaining to or concerning the body; of or belonging to the body or the physical constitution; not mental but corporeal." (At p. 175.) In brief, under definitional unanimity, the ordinary and popular meaning of the word "bodily" does not reasonably encompass the purely mental, emotional and spiritual.

Federal, sister-state and California cases are in accord with the dictionary definition of "bodily" as the term is used in insurance policies. Thus, in *Rolette County* v. *Western Cas. & Sur. Co.* (D.N.D. 1978) 452 F.Supp. 125, 130, the federal court held that the term "bodily injury" in an insurance policy limits the harm covered to physical injury, sickness or disease and does not include nonphysical, emotional harm to the person. (Accord, *American & For. Ins.* v. *Church Sch. Diocese of Va.* (E.D.Va. 1986) 645 F.Supp. 628, 632; *Aetna Cas. & Sur. Co.* v. *First Sec. Bank of Bozeman* (D.Mont. 1987) 662 F.Supp. 1126, 1128; *West American Ins. Co.* v. *Bank of Isle of Wight* (E.D.Va. 1987) 673 F.Supp. 760, 765.) In *Continental Cas. Co.* v. *Synalloy Corp.* (S.D.Ga. 1985) 667 F.Supp. 1550, 1559, the federal court again emphasized that the phrase "bodily injury, sickness or disease" in a CGL policy in no way suggests coverage for nonphysical harm to the person. This is so because in tort actions alleging mental suffering the courts have consistently distinguished physical harm from mental and emotional damage and provided coverage only for bodily, physical harm to the insured.

In *Allstate Ins. Co.* v. *Diamant* (1988) 401 Mass. 654 [518 N.E.2d 1154, 1156], the state court explained that "bodily injury" and "personal injury" are not synonymous notions. The term "personal injury" is broader and includes not only physical injury, but also affront or assault to the emotional well-being of a person. "Bodily injury," by comparison, is a narrow term which encompasses only physical injuries to the body and the consequences thereof. "Bodily injury" as commonly understood "imports harm arising from corporeal contact" and bodily refers to "an organism of flesh and blood" and is not satisfied by anything short of physical injury. In accordance therewith, the court held that the "bodily injury" does not include humiliation, mental anguish or suffering. (*Id.* at p. 1157). In *Presidential Hotel* v. *Canal Ins. Co.* (1988) 188 Ga.App. 609 [373 S.E.2d 671, 672] and *E-Z Loader Boat Trailers* v. *Travelers Indemn.* (1986) 106 Wn.2d 901 [726 P.2d 439, 443], the state courts reiterated that the phrase "bodily injury, sickness or disease" in an insurance policy is unambiguous; that such phrase requires physical injury to the body and does not include nonphysical or mental damages; that the terms "sickness" and "disease" are modified by the word "bodily" and that as a consequence mental anguish, illness and emotional distress are not covered by the express terms of the policy.

This widespread agreement that the "bodily injury" clause of a CGL policy does not cover claims resulting from mere emotional harm is the law of California as well: *Aim Insurance Co.* v. *Culcasi* (1991) 229 Cal.App.3d 209 [280 Cal.Rptr. 766] (review den.). Therein, Grijalva, an employee injured in an automobile accident, sued Culcasi, her employer, for failing to transmit her health insurance application to a group health provider. The complaint alleged a cause of action for negligent infliction of emotional distress. Culcasi tendered his defense to Aim, the issuer of a general insurance policy. That insurance policy provided coverage for bodily injury and property damage similar to the case herein. In a declaratory relief action filed by Aim, the trial court rendered judgment in favor of the insurer.

In affirming the judgment, the Court of Appeal concluded that there was no coverage under the bodily injury clause of the policy because: (1) there was no allegation of damage to tangible property and (2) "bodily injury," defined as "bodily injury, sickness or disease," did not include emotional distress. In resolving the issue of whether the "bodily injury" clause covers claims resulting solely from emotional distress, the reviewing court analyzed the cases decided in California, federal and state tribunals and concluded: "Given the clear and ordinary meaning of the word 'bodily,' we find the term 'bodily injury' unambiguous. It means physical injury and its consequences. It does not include emotional distress in the absence of *physical* injury." (*Aim Insurance Co.* v. *Culcasi, supra*, 229 Cal.App.3d at pp. 220, 224, fn. omitted,

italics in original.) The conclusion reached in *Culcasi* has been recently reaffirmed by *Eastern Airlines, Inc.* v. *Floyd* (1991) 499 U.S. __, __ [113 L.Ed.2d 569, 581, 111 S.Ct. 1489], where the United States Supreme Court held that emotional distress claims without physical injuries are not actionable because the term "bodily injury" in an insurance policy has a narrow meaning excluding purely mental injuries.

We note that the cases relied upon by respondents are distinguishable and do not command a different conclusion. Significantly, *Abellon* v. *Hartford Ins. Co.*, *supra*, 167 Cal.App.3d 21 did not suggest that emotional distress without physical injury constitutes "bodily injury" within the meaning of an insurance policy. Although the *Abellon* court opined that it is difficult to distinguish between physical and mental injuries (*id.* at p. 27), it held only that a wife's loss of consortium may be actionable under the bodily injury coverage of the policy if the emotional distress stemming from the loss of consortium has resulted in bodily injury (*id.* at pp. 26-32).

*Molien* v. *Kaiser Foundation Hospitals*, *supra*, 27 Cal.3d 916 was not an insurance case. Moreover, it did not abolish the distinction between physical and emotional injury, nor did it hold that emotional injury per se is actionable. Instead, *Molien* only emphasized that "bodily injury" is a question of fact involving a medical or psychological problem rather than purely a question of law, and that depending on proof, recovery is permissible for negligent infliction of serious emotional distress. "In our view the attempted distinction between physical and psychological injury merely clouds the issue. *The essential question is one of proof*; whether the plaintiff has suffered a serious and compensable injury should not turn on this artificial and often arbitrary classification scheme. . . ." (*Id.* at pp. 929-930, italics added; accord, *Abellon* v. *Hartford Ins. Co.*, *supra*, 167 Cal.App.3d at pp. 26-27; *Keating* v. *National Union Fire Ins. Co.* (C.D.Cal. 1990) 754 F.Supp. 1431, 1438.) As the court in *Culcasi* observed: *Molien* does "not imply that emotional distress by itself is physical or bodily injury or that it automatically causes such injury." (*Aim Insurance Co.* v. *Culcasi*, *supra*, 229 Cal.App.3d at p. 224.)

The additional California cases cited by respondents (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498 [86 Cal.Rptr. 88, 468 P.2d 216]; *Employers Cas. Ins. Co.* v. *Foust* (1972) 29 Cal.App.3d 382, 386-387 [105 Cal.Rptr. 505]; and *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 296 [131 Cal.Rptr. 547], disapproved on other grounds in *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 740, fn. 9 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161]) are likewise clearly distinguishable. Notably, *Alcorn* and *Foust* do not dispense with the requirement of physical injury in

order to recover for emotional distress. All they teach is that bodily injury includes physical injury resulting from emotional distress. *Newby*, in turn, is irrelevant because it deals with *intentional* infliction of great emotional distress which is an independent tort actionable without a showing of physical injury. (*State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 338 [240 P.2d 282]; *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 648-651 [257 Cal.Rptr. 865, 771 P.2d 814].)

The cases cited by respondents from federal and state jurisdictions (i.e., *Morrison Assur. Co.* v. *North American Reinsurance* (N.D.Ala. 1984) 588 F.Supp. 1324, 1327; *Keating* v. *National Union Fire Ins. Co., supra,* 754 F.Supp. at p. 1439; *Lavanant* v. *General Acc. Ins. Co.* (1992) 79 N.Y.2d 623 [584 N.Y.S.2d 744, 595 N.E.2d 819]; *NPS Corp.* v. *Insurance Co. of North America* (1986) 213 N.J.Super. 547 [517 A.2d 1211, 1212]; *Loewenthal* v. *Sec. Ins. Co. of Hartford* (1981) 50 Md.App. 112 [436 A.2d 493, 499]; *Holcomb* v. *Kincaid* (La.Ct.App. 1981) 406 So.2d 646, etc.) do not compel a different result either because: (1) they represent the minority view on the issue, (2) are for the most part decided without analysis, (3) were disapproved in *Culcasi*, and (4) any precedential value has been further eroded by the recent United States Supreme Court case holding that the bodily injury clause in an insurance policy has a limited meaning which excludes coverage for purely mental injuries. (See *Eastern Airlines, Inc.* v. *Floyd, supra,* 499 U.S. __ [113 L.Ed.2d 569].)

### (2) The "Bodily Injury" Clause of the CGL Policy Does Not Provide Coverage for Emotional Distress for Investment Losses Caused by Negligent Misrepresentation

■ Appellant next contends that respondents' emotional distress claim is not cognizable under the "bodily injury" clause of the policy because emotional distress damages for investment losses caused by negligent misrepresentation are not recoverable. This is so because the "bodily injury" clause herein provides coverage for bodily injury to the person and for *physical injury to*, or destruction or loss of use of, *tangible property*. (See policy definitions, *ante.*) Respondents claimed that they had suffered emotional trauma because of the loss of their investment due to the negligent misrepresentations of Technical Equities officers and directors. Such loss, continues appellant, is injury to *intangible property* and hence by definition, falls outside the coverage of the policy. Appellant's point is meritorious.

The cases interpreting the phrase "tangible property" in a CGL or other general insurance policy unanimously hold that such phrase does not include coverage for economic interests or property rights (such as damages for lost

profits or loss of investment). The cases especially on point are *Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272 [142 Cal.Rptr. 681]; *Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213 [169 Cal.Rptr. 278]; *Allstate Ins. Co.* v. *Interbank Financial Services* (1989) 215 Cal.App.3d 825 [264 Cal.Rptr. 25]; and *Warner* v. *Fire Ins. Exchange* (1991) 230 Cal.App.3d 1029 [281 Cal.Rptr. 635].

In *Fresno Economy* the insured sought declaratory relief for the refusal of its insurer to defend third party lawsuits seeking damages for negligent misrepresentation and breach of implied warranty of fitness. The CGL policy issued to the insured contained a bodily injury and a property damage clause. The latter defined property damage as "injury to, or destruction of, tangible property." In holding that the insurance company had no duty to defend under the policy, the reviewing court reasoned: "The third party complaints set forth no facts which constitute an allegation of personal injury or property damage. While the damages claimed to have been suffered by the plaintiffs relate to the automobiles sold and leased, they are predicated on the misrepresentations made by appellant concerning the automobiles. There are no allegations suggesting that appellant's representations caused injury or damage to the automobiles. To the contrary, *the damage was to the plaintiffs' pecuniary interests—the out-of-pocket loss caused by the fact that plaintiffs did not receive full value for the money paid for* the purchase and lease of *the automobiles. Such loss of anticipated value does not constitute an 'injury to or destruction of tangible personal property' as defined in the policy.*" (*Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co., supra,* 76 Cal.App.3d at p. 279, italics added.)

In *Giddings* the insureds under three public liability policies were sued by third parties for injuries to intangible economic interests, such as losses resulting from banking and securities law violations. The policies provided coverage for property damage which, similar to the case herein, was defined as "destruction of, or injury to, or accidental loss of use of, tangible property. . . ." In a declaratory relief action brought by the insureds the appellate court ruled for the insurance company: "Understood in its plain and ordinary sense, 'tangible property' means 'property (as real estate) having physical substance apparent to the senses' (Webster's Third New Internat. Dict. (1968) p. 2337). To construe the explicit words 'tangible property' to include intangible economic interests and property rights requires a strained and farfetched interpretation, doing violence to the plain language of the policies. Such an interpretation would rewrite the policies to fasten on the insurers a liability they have not assumed. [¶] Moreover, *strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage*

*or injury to tangible property covered by a comprehensive general liability policy* [citations]." (*Giddings* v. *Industrial Indemnity Co., supra,* 112 Cal.App.3d at p. 219, italics added.)

*Allstate* also involved a declaratory relief action between the insurer and the insureds. Allstate issued a business liability insurance policy to defendant Interbank which, akin to the case at bench, contained "bodily injury" and "property damage" clauses in language virtually identical to the policy provisions here at issue. In the underlying complaints the plaintiffs alleged that Interbank acted as a broker-dealer, investment advisor and insurance advisor with respect to offering and selling securities in the form of a tax shelter; that Interbank conspired with other defendants to represent to the public that they were providing safe, secure and conservative tax shelter investments; and that such representations were false, constituting fraud. The appellate court held that Allstate had no duty to defend the insureds in the third party action because under settled law economic losses, like loss of profits and loss of investment do not constitute damage or injury to tangible property covered by the policy. In finding noncoverage the court emphasized: "The policy covers losses resulting from accidental events which cause bodily injury or property damage, not the giving of professional or investment advice. . . . Here, although the insureds attempt to characterize the claims differently, the clear bases of the complaints are that the insureds gave poor professional advice and the plaintiffs lost money in a tax shelter investment. [¶] Had these insureds desired to obtain a professional liability policy to protect them from charges resulting from the performance of professional services, such insurance could have been obtained. . . . [¶] . . . But the insurer who issues a policy for errors and omissions insures against a far different risk than that insured against here. More important, just as an insurer would not reasonably expect that a business liability policy would cover claims for securities fraud, these insureds could not reasonably expect that such claims would be covered under this policy." (*Allstate Ins. Co.* v. *Interbank Financial Services, supra,* 215 Cal.App.3d at pp. 830-831.)

*Warner,* summarizing the applicable law, reiterated that the property damage clause in a CGL policy provides coverage only for damages caused to tangible property, but not for loss to pecuniary or economic interest. In accordance therewith, *Warner* held that since economic damages arising from negligent misrepresentations do not constitute damages to tangible property, they are not recoverable under the bodily injury and/or property damage clause of the policy. (*Warner* v. *Fire Ins. Exchange, supra,* 230 Cal.App.3d at pp. 1034-1035; see also *Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 67 [248 Cal.Rptr. 217]; *Safeco Ins. Co. of America* v. *Andrews* (9th Cir. 1990) 915 F.2d 500, 502; *Allstate Ins. Co.* v. *Miller* (N.D.Cal. 1990) 743 F.Supp. 723, 727.)

In sum, respondents' emotional distress claim was predicated upon the "bodily injury" clause of the CGL policy which incorporated coverage for loss or destruction of tangible property as well. The emotional trauma suffered by respondents was caused by investment losses which, in turn, were occasioned by the alleged negligent misrepresentations of the Technical Equities officers and directors. Respondents' case thus clearly falls within the previously stated principles which deny recovery under the bodily injury and property damage clauses of the CGL policy for loss of economic or pecuniary interest or for investment loss brought about by the negligent misrepresentations of the insured.[2]

(3) *The Wrongful Acts of Technical Equities Were Not "Occurrences" Within the Purview of the Bodily Injury Clause of the CGL Policy*

The CGL policy provided coverage for bodily injury if the latter was caused by an "occurrence." "Occurrence" was defined as "an *accident*, including continuous or repeated exposure to conditions, which result in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (See, *ante*, italics added.) Respondents' complaint alleged that they had suffered financial losses with the resultant emotional trauma because Technical Equities induced them to invest through fraud and negligent misrepresentation. The trial court found that the misrepresentations alleged by respondents *constituted multiple occurrences within the meaning of the CGL policy.* ■ Appellant argues that, contrary to the finding of the trial court, the wrongful conduct averred by respondents did not constitute an accident and that, absent an accident, there was no occurrence triggering coverage under the bodily injury clause of the CGL. We agree.

Under the interpretation of the case law, "occurrence" as defined in a CGL policy means "accidental." In its plain, ordinary sense, "accidental" means " 'arising from extrinsic causes[;] occurring unexpectedly or by chance[; or] happening without intent or through carelessness.' " (*St. Paul Fire & Marine Ins. Co.* v. *Superior Court* (1984) 161 Cal.App.3d 1199, 1202 [208 Cal.Rptr. 5], fn. omitted, brackets in original; *Merced Mutual Ins. Co.* v. *Mendez* (1989) 213 Cal.App.3d 41, 48 [261 Cal.Rptr. 273].) Since insurance is designed to protect against contingent or unknown risks of harm, rather than harm that is certain or expected (*Chu* v. *Canadian Indemnity Co.* (1990) 224

---

[2]Although under general principles, emotional distress damages resulting from financial losses are recoverable if caused by willful deceit, i.e., intentional fraud (BAJI No. 12.85; *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 916-917 [114 Cal.Rptr. 622, 523 P.2d 662]; *Sprague* v. *Frank J. Sanders Lincoln Mercury, Inc.* (1981) 120 Cal.App.3d 412, 417 [174 Cal.Rptr. 608]), the CGL policy at issue specifically excludes coverage for damages intentionally inflicted (see discussion, *post*).

Cal.App.3d 86, 94-95 [274 Cal.Rptr. 20]), it is well settled that intentional or fraudulent acts are deemed purposeful rather than accidental and, therefore, are not covered under a CGL policy (*Insurance Co. of the West* v. *Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1318 [241 Cal.Rptr. 427]; *American Guar. & Liability* v. *Vista Medical Supply* (N.D.Cal. 1988) 699 F.Supp. 787, 789-790).

Even more to the point (and contrary to respondents' assertion) it is likewise established that negligent misrepresentations causing investment loss or loss of other economic interest are considered purposeful rather than accidental for the purpose of insurance coverage. *Safeco Ins. Co. of America* v. *Andrews, supra*, 915 F.2d 500, is directly on point. Therein, the insurance company issued Andrews a homeowners insurance policy which provided coverage for bodily injury and property damage caused by an "occurrence." The "occurrence" giving rise to liability was defined in the same language as in the policy here under review. The property was sold to Kuehl, who sued Andrews and others for negligent failure to inspect the property and to disclose the defects and for misrepresentations. In holding that Safeco had no duty to defend, the reviewing court stated: "Kuehl is seeking damages for Andrews's alleged negligence in failing to inspect and inform him of defects in the property and for misrepresentation 'materially affecting the value or desirability' of the property. Kuehl's claims do not expose Andrews to liability for any damage to tangible property, but rather for economic loss resulting from Andrews's alleged failure to discover and disclose facts relevant to the property's value and desirability. Such harm is outside the scope of the policy. [Citation.] Although the defective condition of the property is an element of Kuehl's claims, the defects cannot, even when interpreting the policy broadly, be considered the *cause* of Kuehl's damages. *The cause of the damage was Andrews's alleged misrepresentations, which are not an 'occurrence'* or a 'peril insured against' *under the terms of the policy. There is, therefore, no potential for liability that arguably comes within the scope of the insurance coverage provided by Safeco.*" (*Id.*, at p. 502, second and third italics added.) The conclusion reached in *Safeco* is in accord with *Chicago Title & Trust* v. *Hartford Fire Ins. Co.* (N.D.Ill. 1976) 424 F.Supp. 830, 835, where the court held that negligent business conduct is not an occurrence triggering a duty to defend under a CGL policy. (See to the same effect *Globe Indem. Co.* v. *First American State Bank* (W.D.Wash. 1989) 720 F.Supp. 853, 857, where the court opined the allegation that the bank's records were in disarray, which was part of the claim of a scheme to defraud the investors, does not establish an "occurrence" for the purpose of policy coverage.) The underlying rationale of this rule is that negligent misrepresentation requires intent to induce reliance and, therefore, is a subspecies or

variety of fraud which is excluded from policy coverage. (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487-488 [275 P.2d 15]; *Blankenheim* v. *E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1472-1473 [266 Cal.Rptr. 593].)

We briefly observe that *Keating* v. *National Union Fire Ins. Co.*, *supra*, 754 F.Supp. 1431, the principal case relied upon by respondents, is distinguishable. In *Keating* the underlying complaints against the insureds alleged both negligent supervision and direct negligent misrepresentations. Based upon the pleading, the district court held that negligent supervision could constitute an "occurrence" under the policy language because that type of liability does not require intent and, hence, can qualify as an "accident" which is entitled to coverage. (*Id.* at p. 1440.) By contrast, respondents' complaint against the Technical Equities officers and directors alleged only direct negligent misrepresentations not negligent supervision. It follows that the rule espousing coverage for negligent supervision simply does not obtain in the present case.

### B. *Coverage for Advertising Liability*

The CGL policy provided coverage for personal injury and advertising injury liability in the following language: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of personal injury or advertising injury to which this insurance applies . . . ." (Italics added.) In the definition of the policy, "advertising injury" means "injury arising out of an offense committed during the policy period *occurring in the course of the* named *insured's advertising activities, if such injury arises out of* libel, slander, defamation, violation of right of privacy, piracy, *unfair competition*, or infringement of copyright, title or slogan." (Italics added.)

The trial court held that the CGL policy granted coverage for advertising liability because (1) the Technical Equities investors were injured as a result of "unfair competition" as the term is defined in section 17200;[3] and (2) the distribution of false and misleading materials (annual reports, newsletters, etc.) to the investors (including respondents) constituted advertising activities within the meaning of the policy.

Appellant argues that both of these holdings are erroneous because: (1) the "unfair competition" specified in the policy means the common law

[3]Section 17200 provides that "[a]s used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

tort of unfair competition (i.e., competition against the business rival by taking and using as one's own that which belongs to the competitor), rather than unfair and deceptive practices committed against the public as defined by the statute; and (2) "advertising activity" within the meaning of the policy requires distribution of information to the public at large, rather than to a select group of individuals. In countering the arguments, respondents maintain that in California the term "unfair competition" is not limited to injury to business competitors but is broadly defined so as to include any unlawful, unfair or deceptive business practice committed against the consumers (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 109 [101 Cal.Rptr. 745, 496 P.2d 817]; *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209-210 [197 Cal.Rptr. 783, 673 P.2d 660]); and/or that the term "unfair competition" is ambiguous at the very least which ambiguity must be construed against the insurer (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co., supra,* 41 Cal.3d at p. 912; *Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at pp. 807-808). In addition, respondents argue the phrase "advertising activities" as used in the policy is broad enough to embrace the distribution of promotional materials to the investors, especially where, as here, the dissemination of such materials is designed to induce the investors to reinvest in the company. Respondents' argument is not meritorious.

(1) *The Advertising Liability Clause of the Policy Provides Coverage Only for the Common Law Tort of Unfair Competition*

The issue of coverage for unfair competition under the advertising liability provisions of a CGL has been recently decided in *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545]. Therein, our Supreme Court concluded that the term "unfair competition" as used in the policy language defining advertising injury refers to the common law tort of unfair competition rather than to the conduct prohibited under the Unfair Business Practices Act. (§ 17200 et seq.; *Bank of the West* v. *Superior Court, supra,* at pp. 1263-1264, 1272.)

Our Supreme Court pointed out that when read in context, as it must be (*Producers Dairy Delivery Co.* v. *Sentry Ins. Co., supra,* 41 Cal.3d at pp. 916-917), the phrase "unfair competition" is not ambiguous. It clearly means the common law tort of passing off one's goods as those of another rather than fraudulent practices against the public as defined in the statute. This determination is compelled, the court reasons, primarily because, although the insurer is obligated to pay damages under the advertising liability clause, the available remedies for violation of the Unfair Business Practices Act are

merely injunction and restitution; damages cannot be awarded. (§ 17203;[4] *Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 774 [259 Cal.Rptr. 789]; *Industrial Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1093, 1095-1097 [257 Cal.Rptr. 655].) Read in context, continues the Supreme Court, the term "unfair competition" can refer only to a civil wrong that can support an award of damages. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265.)

In explaining the public policy considerations behind the foregoing conclusion, the Supreme Court underscored that to provide insurance coverage for restitution would encourage violation of the law by the insured and would allow retention of his ill-gotten gain: "If insurance coverage were available for monetary awards under the Unfair Business Practices Act, a person found to have violated the act would simply shift the loss to his insurer and, in effect, retain the proceeds of his unlawful conduct. Such a result would be inconsistent with the act's deterrent purpose. As we have previously explained, ' "[t]o permit the [retention of even] a portion of the illicit profits, would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom." ' [Citations.] . . . [¶] . . . When the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law. Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer. [Citations.]" (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at pp. 1267, 1269, fn. omitted, brackets in original.)

The Supreme Court summarized its holding in the following language: "[T]he Unfair Business Practices Act does not authorize an award of damages, and a definition of 'unfair competition' that cannot support a claim for damages cannot reflect the objectively reasonable expectations of the insured. Accordingly, we hold that the policy term 'unfair competition' does not refer to conduct that violates the Unfair Business Practices Act. (§ 17200 et seq.) Because the context elucidates the meaning, there is no need to resort to the rule that ambiguities are resolved against the insurer. [Citation.]" (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1272, fn. omitted.)

[4]Section 17203 provides that "[a]ny person performing or proposing to perform an act of unfair competition within this state may be *enjoined* in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary *to restore* to any person in interest any *money or property*, real or personal, which may have been acquired by means of such unfair competition." (Italics added.)

Since, in the cases herein, respondents sued the Technical Equities officers and directors for deceptive business practices (fraud, negligent misrepresentation, breach of fiduciary duty and negligence) violating the Unfair Business Practices Act rather than for the common law tort of competitive rivalry, under *Bank of the West* they were not entitled to coverage under the advertising liability provisions of the policy.

### (2) *We Need Not Decide Whether Distribution of Promotional Materials to Investors Constitutes Advertising Activity Within the Purview of a CGL Policy*

Appellant's alternative contention is that there was no coverage under the advertising liability provisions of the CGL policy because the distribution of promotional materials (such as mailings, annual reports, newsletters, etc.) to the investors does not constitute "advertising activity" as envisioned by the policy.

Because we find that *Bank of the West* dictates our holding that the advertising liability clause of the CGL policy does not cover the unfair and deceptive business practices, we need not decide whether the distribution of promotional materials to investors is "advertising activity" within the meaning of the policy (cf. *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1276, fn. 9).

### (3) *Admission of Liability by Insurer's Employees Does Not Establish Liability*

■ Respondents' final argument that there was coverage for advertising injury under the terms of the CGL policy because National Union's employees themselves admitted the existence of such liability requires but a brief reply. It is well settled that the interpretation of an insurance policy is a *legal* rather than a *factual* determination (*Nash* v. *Prudential Ins. Co. of America* (1974) 39 Cal.App.3d 594, 602 [114 Cal.Rptr. 299]; *Congleton* v. *National Union Fire Ins. Co.* (1987) 189 Cal.App.3d 51, 59 [234 Cal.Rptr. 218]). Consistent therewith, it has been held that opinion evidence is completely irrelevant to interpret an insurance contract. (*Pacific Indemnity Co.* v. *Fireman's Fund Ins. Co.* (1985) 175 Cal.App.3d 1191, 1203 [223 Cal.Rptr. 312]; *Wolf Machinery Co.* v. *Insurance Co. of North America* (1982) 133 Cal.App.3d 324, 329 [183 Cal.Rptr. 695].)

### C. *Award of Attorney Fees*

The trial court awarded attorney fees to respondents in the sum of $12,500. The award was apparently based on *Brandt* v. *Superior Court*

(1985) 37 Cal.3d 813, 817 [693 P.2d 796], which allows attorney fees as part of damages for the insurer's failure to deal fairly and in good faith with the insured. In the case herein, the finding of breach of an implied covenant of good faith and fair dealing was predicated upon certain company documents which showed that, in violation of two court orders, appellant intentionally failed to disclose the existence of the CGL policy at the settlement conference and did reveal it only on March 28, 1988, shortly before trial. Although the documents contained confidential communications between attorney and client, the trial court held that such documents were not protected by the attorney-client privilege and were admissible under Evidence Code section 956[5] because National Union employed the services of a lawyer to enable or aid in its plans to violate a court order by failing to reveal the existence of a CGL policy.

Appellant claims that the award of attorney fees was improper because it was not based upon a tort. In further elaborating on this theme appellant contends that it did not violate the court orders; that the admission of the legally protected document was erroneous under Evidence Code section 956; and that the finding of conspiracy to commit fraud and/or failure to deal in good faith is not supported by sufficient evidence.

Respondents deny that any of the court rulings was incorrect and assert in the alternative that we need not decide the sufficiency of evidence supporting the finding of bad faith because that issue has been extensively litigated in the companion case of McLaughlin. Simultaneously, in order to avoid a potential defense of collateral estoppel in the companion cases, respondents agree that National Union has preserved that issue for future determination.[6] Respondents furthermore suggest that "if there is a question as to the facts the court relied on to make its [attorney fees] award, the award should be remanded to the trial court to allow it to make the necessary findings."

We agree with respondents and decline to review the lower court's ruling as to both the propriety of the discovery order and the award of attorney

---

[5]Evidence Code section 956 provides that "[t]here is no privilege under this article [relating to the lawyer-client privilege] if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud."

[6]Respondents' reply brief states, inter alia: "A tremendous amount of additional evidence regarding the bad faith of this insurance company came in during the *McLaughlin v. National Union* trial and will ultimately be reviewed by this Court. *There is no need to rule on the discovery order now. Plaintiffs agree that National Union has preserved its record.* A decision on the propriety of the release of the communications should come in a case where it is relevant and where it can be fully briefed with access to all of the evidentiary material." (Italics added.)

fees. It appears that appellant raises the discovery issue in order to avert a claim of waiver or the defense of collateral estoppel in other appeals, but concedes that it is irrelevant here.[7] Appellant's concern is unfounded.

National Union has vigorously challenged the charge of unfair dealing in both the trial court and on the present appeal. Upon respondents' suggestion, we have declined to address and determine this issue on appeal. It follows that in the absence of an explicit, intentional waiver by appellant and a judgment adjudicating the issue with finality, the litigation of unfair dealing in the companion case (or cases) is not barred by either the doctrine of waiver or collateral estoppel.

We finally note that since the propriety of awarding attorney fees to respondents turns on a finding whether, in light of all the evidence (including evidence introduced in McLaughlin), appellant was guilty of a tort (i.e., breach of an implied covenant of good faith and fair dealing [*Brandt* v. *Superior Court, supra*, 37 Cal.3d at p. 817]), we remand the cause of attorney fees to the trial court for reevaluation of the propriety of the award after the judgment in McLaughlin becomes final.

## III. DISPOSITION

We summarize our holdings as follows: (1) emotional distress without physical injury does not constitute "bodily injury" within the meaning of the CGL policy; (2) the "bodily injury" clause of the CGL policy does not cover claims for emotional distress for investment losses caused by negligent misrepresentations; (3) the wrongful activities of the Technical Equities directors and officers were not "occurrences" within the purview of the "bodily injury" provisions of the CGL; and (4) the advertising liability clause of the CGL policy provides coverage for unfair competition as it is defined in the common law (i.e., for competitive rivalry) rather than for unfair and deceptive business practices committed against the public as defined by statute. The judgment rendered in the declaratory relief action is accordingly reversed. The order awarding attorney fees is reversed and the

---

[7]Appellant's opening brief states in pertinent part: "This issue is important because the assertion National Union concealed the CGL policy was parlayed by plaintiffs into the most important alleged act of bad faith in the subsequent *McLaughlin* v. *National Union* bad faith action. This issue affected and infected every aspect of the *McLaughlin* trial and contributed directly to the $49,000,000 judgment, a judgment which the trial court held collaterally estopped National Union from contesting liability in *Abelson* v. *National Union*, which resulted in a $120 million judgment. Because this serious accusation first arose in the present case, we address it here. . . ."

matter is remanded to the trial court for reevaluation. Respondents to bear costs on appeal.

Perley, J., and Reardon, J., concurred.

A petition for a rehearing was denied November 25, 1992.