## SIMPSON V. ROBINSON.

1. **"IMPROVEMENT:"** *Meaning of, under our land system.*

   An "improvement," under our land system, does not mean a general en-
   hancement of the value of the land by the occupant's operations. All
   works directed to the erection of houses for families, or which are substan-
   tial steps towards bringing lands into cultivation, have, in their results,
   the specific character of improvements. The true test is, are they real
   and made *bona fide* in accordance with the policy of the law, or are they
   only colorable and made for the purposes of fraud or speculation ? As to
   their value, if they have any at all, the amount is immaterial.

2. **DONATION LANDS :** *Section 3905, Gantt's Digest, construed.*

   The State Land Commissioner could not, under section 3905, Gantt's Digest,
   sell to the owner of an improvement, the land donated to another, until
   the three months allowed to the donee to pay for the improvement, and
   the thirty days for filing with the Commissioner the owner's receipt for
   the payment, had both expired.

3. **LIEN :** *Of State for purchase money of school land, superior to the lien for
   subsequent taxes.*

   The lien of the State, for the purchase money for school lands, is prior and
   superior to her lien for taxes for general revenue, and is not merged in
   the legal title acquired by the State in the forfeiture of the land for taxes;
   and a sale in Chancery, by the State, to enforce the school lien, made af-
   ter the forfeiture for taxes, passed the whole title to the purchaser, free
   from the lien for taxes, and a subsequent donation of the land was void.

Simpson v. Robinson.

APPEAL from *Lonoke* Circuit Court in Chancery, Hon. J.W. MARTIN, Circuit Judge.

The opinion states the case.

*Hallum & England*, for appellant:

The theory of Robinson's title is, that the land was forfeited to the State, because of Simpson's failure to pay for the alleged improvement; *Litchfield* v. *Steel*, 21 *Ark.*, 437. But the title acquired by a second donee is only *prima facie* evidence, and may be impeached for error or fraud. *Surginer* v. *Paddock*, 31 *Ark.*, 528.

As to what is an "improvement," see the emphatic language of this Court in *McIvors* v. *Williams*, 24 *Ark.*, 33, and *White* v. *Green*, 24 *Ark.*, 38. In each of these cases the Court took into consideration the "preponderance of proof." See also *Paty* v. *Harrel*, 24 *Ark.*, 40. "It does not belong to plaintiff to object to the smallness of defendant's improvement, when his own does not *largely partake of the qualities of a substantial improvement.*" *Schaer* v. *Gliston*, 24 *Ark.*, 137. Such improvements must be in their nature *permanently beneficial*. *Parsons on Contracts*, vol. 3, sec. 22 (6th *Ed.*), and particularly *Worthington* v. *Young*, 8 *Ohio*, 401; *Matthews* v. *Davis*, 6 *Humph.* (*Tenn.*), 324. They must be of a *permanent* character. 2 *Kent. Com.*, side *p.* 335-6-7, and cases cited; must *augment the property in value*; *Ib.*, 337; be "valuable and lasting;" *West* v. *Williams*, 15 *Ark.*, 682; and "permanent and useful;" *McDonald* v. *Fowler*, 12 *Ark.*, 218.

Robinson's affidavit was false in two respects:

*First.* As to the value and extent of the improvement.

*Second.* As to the S. W. S. W. ¼. This was a *fraud*, and fraud avoids *ab initio*. *Strayhorn* v. *Giles*, 22 *Ark.*, 517; *Cooper* v. *Merritt*, 30 *Ark.*, 686; *Kerr on fraud*, etc.,

Simpson v. Robinson.

41, 152, *and cases cited*.  *Farmers' Bank* v. *Groves*, 12*
*How.* 51 ; *Kinney* v. *Keernan*, 2 *Lane*, 492 ; *Voorhies* v.
*East*, 2 *Hill*, 288 ; *Jankins* v. *Simpson*, 2 *Shep.*, 364 ; *Foy*
v. *Oliver*, 20 *Vermont*, 118 ; *Jennings* v. *Gage*, 13 *Ill.*, 610 ;
*Mason* v. *Boyd*, 1 *Denio*, 74 ; *Clarkson* v. *Mitchell*, 3. *E.*
*D. Smith*, 269 ; *Jewett* v. *Petit*, 4 *Mich.*, 508 ; *Kimball* v.
*Cunningham*, 14 *Mass.*, 504 ; *Stephens* v. *Hyde*, 32 *Barb* ;
*McGuire* v. *Callahan*, 19, *Ind.*, 128.

Was the deed good as a whole? If bad in part, it was
bad *in toto*. "The transactions cannot be rescinded, as to a
part, and left in force, as to the rest.   See cases just cited,
*supra*.   *Kerr on Fraud*, 53 to 142.

The term " improvement " had a well known and settled
meaning, a technical signification, long before the passage
of the act, January eleventh, 1851, and the Legislature em-
ployed it in its well settled meaning. Viewed in this light,
Robinson had no improvement.

*Clark & Williams*, for appellee :

A deadening is an "improvement," involving expense
and labor, and if the improvement was worth *anything*, the
deed to Robinson was good.

This Court will not disturb a decree, upon a mere ques-
tion of facts, where there is nothing but a question of pre-
ponderance of testimony.   It will not be disturbed, unless
palpably wrong.   *Branch* v. *Mitchell*, 24 *Ark.*, 432.

Section 3905, Gantt's Digest, has been too often sustained
ed to be now questioned.   *Lacefield* v. *Steel*, 21 *Ark.*, 437 ;
*Surginer* v. *Paddock*, 31 *Ark.*, 529.

### ON THE CROSS APPEAL.

Robinson's title depended on his improvements, and not
upon his original title.   The land was a compact and con-
tiguous body, and his rights were as broad as the forfeiture
for taxes.

OPINION

EAKIN, J.   This is a bill and cross-bill between claimants of the same land under conflicting deeds from the State, each seeking to have his own title quieted, and that of the other, cancelled.

The controversy involves two distinct tracts ; one, embracing the north half of the southwest quarter, and the northwest quarter of the southeast quarter of the section, consisting of three forties lying side by side, was forfeited to the State for the taxes of 1870.   The other, consisting of a single forty, to-wit: the southwest quarter of the southwest quarter, lying contiguous to one of the forty acre tracts in the first, was forfeited for the taxes of 1871. All were originally school lands, lying in section 16 of Township, 2 North, Range 9 West.   There is nothing to show that they had previous to their respective forfeitures, been owned or claimed together.

The first named tract, after its forfeiture, had been sold under a decree of the Pulaski Chancery Court, against the former owner, in favor of the State for the purchase money.

The complainant, Robinson, claimed under the purchaser, an equitable title by parol contract, and part performance. He claims also, to have made valuable improvements before the seventeenth day of December, 1877, with a view to building and cultivation.   At that date defendant, Simpson, applied to, and obtained from, the State Land Commissioner a donation of both said tracts, making in all, one hundred and sixty acres, of which one hundred and twenty acres were in the same quarter section and forty in the one adjoining.

Afterwards, complainant Robinson, on the eighteenth day of February, 1878, and after the expiration of three months from the date of the donation to Simpson, made an

affidavit that at the time of said donation, he was himself the owner of an improvement upon said lands, describing both tracts ; that said improvements were worth one hundred dollars, and that neither Simpson nor any one for him had paid or tendered him the double value of said improvements, or any other sum.    Upon filing this affidavit with the Land Commissioner, he was allowed to purchase all of said lands for arrearages of taxes, in accordance with the Act of January 11, 1851, and the Commissioner executed to him a deed accordingly.

The Chancellor, upon the hearing, found that the improvements were real, substantial, and such as it was the policy of the law to protect, but that they had not been made by Robinson with any reference to the southwest quarter of the southwest quarter of the section, and could not be made to cover more land than complainant then claimed, or intended to claim, when the improvements were made, and limited the extent of his relief to the lands he had purchased, and was improving for his own use.    Whereupon a decree was rendered in effect quieting the title of complainant Robinson to the north half of the southwest quarter, and the northwest quarter of the southeast quarter ; and that of defendant Simpson, to the southwest one-fourth of the southwest one-fourth of the section.    The costs were divided.

The depositions conduce to show that Robinson, after his parol purchase of the lands in 1877, entered in good faith upon the three forty-acre tracts, without any knowledge at the time, that they had been previously forfeited to the State for non-payment of taxes.    He considered and used the land as his own, selling from it wood and cross-ties.    He deadened five or six acres of wood land in the manner usual in bringing lands into cultivation ; and had removed the shrubs, and cleared off a portion of that which had been deadened.    He had made rails, and house logs had been

Simpson v. Robinson.

prepared for fencing and building, but never put up. After-wards, and for at least a year before the donation to Simpson, there was a cessation in the work of improvement. The cleared land had grown up with sprouts, and the greater part, almost all indeed, of the rails. and house-logs had been hauled off and used upon another place by Robinson, or with his consent. Although the deadening was of *some* value, it could not have been worth near the amount claimed, to any one who might wish to resume and complete the improvement. It is tolerably plain, also, that the deterioration of the land from the cross-ties and other timber hauled away, more than counterbalanced the enhancement of value arising from the work.

The defendant (appellant) contends that under this state of the testimony there was really no improvement which, under the policy of the law, he was bound to notice or pay for, and that the subsequent purchase by Robinson, or an *ex-parte* application, without notice, was fraudulent.

An "improvement" under our land system does not mean a general enhancement of the value of the tract from the occupant's operations. It has a more limited meaning, which has in view the population of our forests, and the increase of agricultural products. All works which are directed to the creation of homes for famlies, or which are substantial steps towards bringing lands into cultivation, have in their results the special character of "improvements," and under the land laws of the United States, and of the several States, are encouraged. Sometimes their minimum extent is defined as requisite to convey rights. In other cases not. But the test which runs through all the cases, is always this: Are they real and made *bona*, *fide* in accordance with the policy of the law, or are they only color-able and made for the purpose of fraud or speculation?

A review of all the testimony leaves but little doubt that

1. IM-PROVE-MENT: Meaning of, under our land system.

Robinson's deadening, clearing, etc., was made in good faith. There is no evidence to show that he then doubted his title, or knew of the previous forfeitures, or was fortifying against a donation not actually made to another, until more than a year after he had ceased his improvements and taken away his rails and house logs.

He would not have been apt thus voluntarily to diminish the value of any improvements made with colorable motives. There is every indication that he had it in view to open the land and build a house. The deadening was a necessary step, and so far an improvement.

After the removal of the rails and house logs it was certainly of no great value, but if there was any value at all, of a real and substantial nature, the amount was not important, nor could it be cancelled by deterioration of other parts of the land, not interferring with the immediate purposes of the improvement. Whether the value was much or little, it was the duty of Simpson to take cognizance of it, upon examination of his gift, ascertain the value, and tender a double amount to Robinson. The finding of the Chancellor, that the improvement had a substantial value, at the time of the donation, seems to be sustained by the preponderance of the testimony. It would not be disturbed if the balance were even, and we therefore find no error in that.

There is nothing in our past legislation which better illustrates the extreme tenderness of the State towards owners, of bona fide improvements, and jealousy in guarding them, than this act of January 11, 1851, taken in connection with the provisions for donations. It has been repealed since the transactions involved in this case took place; but was for eighteen years the settled policy of the State. It was felt at an early period, that the true prosperity of the State and the growth of her taxable resources depended upon the multiplicity of actual settlers, whilst the greatest impedi-

Simpson v. Robinson.

ment, in the way of such results, was to be apprehended from the accumulation of large quantities of her rich but unreclaimed forests, in the hands of capitalists, to be held for speculation. In accordance with this policy the courts have been more liberal, perhaps, than those of any other State, in sustaining tax titles, against mere technical objections, when taxes have been actually due and neglected without reasonable cause.

As early as 1840, for the double purpose of encouraging actual settlers and protecting those showing an intention to become so, laws were passed for donations in limited quantities, to heads of families, of lands which had been forfeited for taxes, and fruitlessly offered for sale by the Auditor. They were made on certain conditions of improvement, to be made in a time adapted to the ability of the poorest immigrant. But these donations, even upon such conditions, were considered mere matters of grace. They were not called upon to advance arrearages of taxes, or pay any thing whatever. But it was sternly exacted of them, that, in their selections of forfeited lands, they should respect the claims of the unwary, or the unfortunate, whose *improvements* had been forfeited, so far, at least, as to pay them the double value of their improvements. Originally this was not, however, made a condition of the donation. The improver was driven to the courts to recover. Experience soon showed, what might indeed have been obvious at first, that this afforded but little protection to a class of men too poor for litigation. Besides, no time was fixed for the payment; hence the act of January 11th, 1851. It recited the inadequacy of the existing law and provides (as adopted in *Gantt's Digest*, *section 3905*), that:

"It shall be the duty of every person who has obtained a donation of a tract of improved land, within *three months* from the date of the deed, to pay to the owner of such im—

provement double the value thereof ; and to take from such person his receipt for the amount of money so paid ; which receipt shall, within *thirty days* thereafter, be filed with the Auditor ; and should any such improvement not be paid for by the donee, and his receipt, showing such payment, shall not be filed with the Auditor, within the time prescribed, such donee shall forfeit all right to the land ; and the owner of such improvements, upon filing with the Auditor his affidavit, stating that he owned an improvement on the land at the time it was donated, and that the donee has not paid nor tendered to him double the value of such improvement, if the time allowed for making such payment, *and* for filing the receipt as evidence thereof, shall have elapsed, shall be allowed to purchase said land, including his improvement, by paying all arrearages of taxes which may be charged thereon, in the same manner as if the land had never been donated ; and the Auditor shall execute to such purchaser a deed for the same, which shall have the same validity, force and effect, and be evidence of title, as other deeds executed by the Auditor for lands sold for taxes.''

This act was sustained and construed in *Lacefield* v. *Stell*, 21 *Ark.*, 437, which, like this, was a case of contest between a donee (who was a minor) and the unpaid owner of an improvement ; who, upon his affidavit, was subsequently allowed to purchase from the State, under the act. It was not necessary to decide in that case, as it is not in this, whether or not one having an improvement on the land at the time of forfeiture ceased to become the owner, and thereby lost the benefit of the act. It seems that such a construction would contravene the policy of the act, but the question does not arise. The improvements in this case were made after the forfeiture. That case settles the question, that no demand of payment by the improver was required, nor notice to the donee of the subsequent applica-

tion to purchase. The same points were expressly ruled in *Surginer, Adm'r.*, v. *Paddock*, 31 *Ark.*, 529, in which case it may be remarked, *en passant*, that the question did arise, and was much pressed, as to the *time* of the improvements. The court failed to see that it was material whether the improvements were made before or after the forfeiture; holding that although technically the improvements passed to the State with the land, yet she might, and intended as a matter of grace, to treat the former owner as against her donee, as still the owner. In which view, as remarked by JUSTICE WALKER: "If it is the pleasure of the Legislature to give the land to a person, on condition that the donee shall, within a prescribed time, pay or tender to such owner of an improvement double the value thereof, and the donee accepts the gift on such conditions, what right has he to complain? None, we think."

So far as the decree of the Chancellor asserts the right of Robinson to purchase of the State the lands upon which his improvements were made, without demand of the double value from the donee, or notice of his application, and *at the proper time*, to receive a deed from the Commissioner (to whom that power is now transferred), the views of the Chancellor were well sustained, upon authority. We think, too, upon principle, and a fair construction of the act, that his right to purchase was limited to the lands which he claimed when the improvements were made. He made the improvements to enhance the value of property which he held by metes and bounds, under a parol contract, and which were efficient to give him equitable title, as part performance. The adjoining forty was not in his contemplation, and the improvements cannot well be considered as extending to it. Upon all the points made and argued in the court below, or here, the views of the Chancellor are sound.

Simpson v. Robinson.

We cannot, however, overlook some other points presented by the record, which ought not to be passed *sub silentio*, as they so enter into the case that to do so would lead to error.

2. DONA-TION LANDS: Sec. 3905, Gantt's Digest, construed. The purchase by complainant for arrearages of taxes, by virtue of his unpaid improvements, was clearly and palpably premature. The forfeiture of the donee could not occur under the act, where the improvements were not actually paid for, until the expiration of three months, *and* the thirty days allowed to file the receipt with the Auditor. This time had been allowed to expire in the cases of *Lacefield* v. *Stell* and *Surginer, Ad.,* v. *Paddock* (*supra*), so that the construction of the Statute did not arise. In this case the owner of the improvement was allowed to purchase at the expiration of three months and two days. It was a matter of power, and the Commissioner could not make the deed sooner. It is no answer to say that as the payment had not been made within the three months, it would have been a vain thing to give thirty days for the filing of a paper, the very existence of which had become impossible. There is no reasoning against Statutes conferring powers, on certain conditions where there would be no powers nor equities independent of the Statute. *Ita lex scripta est*, is then imperative and inflexible. The conditions must exist; besides, the law is reasonable. If the purchase, on one hand, is to be allowed on the mere affidavit of the applicant, as to the *fact* that no payment had been made, it is but just on the other that the *fact* should be further rendered probable by the failure of the donee to file the receipt within the time required. There should be no action until the full time expires. The deed of complainant from the Commissioner was wholly void, and offered no basis for any relief.

But there is a prayer for general relief, and we are brought to consider whether there was anything else in the

case, which might properly be shown, under the pleadings, to entitle complainant to the relief granted, or any other.

It is shown the lands were 16th Section lands. By act of July 25, 1868, the proceeds of the sale of all those lands had been taken under the control of the State, and transferred to the Common School Fund. They were the property of the State, and held for Common School purposes. The State had a lien upon all those lands which had been or might thereafter be sold for the payment of the purchase money.

The pleadings and the Commissioner's deed exhibited, show that the tract of land first mentioned, composed of the three contiguous forties, being school lands, had been sold under a decree of foreclosure in the Pulaski Chancery Court, in favor of the State, for the purchase money, rendered on the thirteenth day of June, 1873, against one J. Scott Gray; and had been purchased at the Commissioner's sale, on the twenty-seventh day of July of that year, by A. J. Ligate, for $138, to whom the Commissioner executed a deed, and that the sale had been duly reported to the court and approved. It further appears, from the pleadings and evidence, that Ligate bargained and sold said lands to one Thomas Staggs, who, on his part, in 1874, bargained and sold the same by parol contract to complainant; and that complainant, on his part, entered upon the lands in pursuance of said contract, and made the improvements under which he claimed. It was only by taking cognizance of the facts, and of complainant's equitable claim and its extent, that the Chancellor could find grounds for limiting the relief to these three forties, and refusing to extend it to all the lands embraced in his subsequent purchase from the State for arrearages of taxes. It is interesting to trace the rights and equities of the several parties, as they were affected by

these facts, and the forfeiture of the lands for taxes in 1871.

By act of January 10, 1851 (*Gantt's Dig.*, sec. 3984), "No tax title shall be valid or binding against the equitable or legal interest of this State, in any real estate whatever ; but such tax titles are and shall be void, so far as the same shall conflict with the interest of the State, and shall be treated and considered as null and void in all courts."

Denuded of tautology, this means that tax titles are good, except in so far as they conflict with the vested interests of the State.

3.   LIEN: No taxes accrued upon these lands in question, until after
Of State their sale for the benefit of the school fund. The lien of for pur-
chase of the State for the purchase money was prior and superior to school
land, su- her lien for taxes going to her general revenue. Upon for-
perior to lien for
taxes. feiture for these taxes, the whole title vested in the State, but her lien for the school fund was not thereby merged in her legal title. The doctrine of merger never applies where there are any equities which would be thereby defeated. She claimed the forfeiture for general purposes, but the lien for the school fund was a trust in her hands, she held in accordance with these equities ; that is, the lands were hers for general revenue purposes—subject, in her hands, to the satisfaction of the debt due the school fund.

If, in this state of things, she had made a donation, the donee would have taken just what she got by the forfeiture ; that is, the lands subject to the school fund debt, which the donee might have redeemed. If afterwards she had foreclosed without making the donee a party, it might be a question whether this right of redemption would be taken away ; a question not indeed without difficulties. But the foreclosure in this case does not raise the question. At the time the decree was made, and the lands sold, under order of the Chancery Court, there were no outstanding interests

to be preserved—no interests not owned and constructed by the State herself, which was in court, making the foreclosure. The legal result would be that the sale under the first lien would pass the whole title, legal and equitable. The trust would be fulfilled, and that is all to which a court of equity would feel constrained to look. If her lien for arrearages of taxes be thereby lost, it is a matter disconnected with the trust, and results from imperfect legislation on a complicated subject.

It is not necessary to consider whether or not the State might, by a bill properly framed, have foreclosed for the whole that was due, applying the proceeds first to the school fund, and the surplus to the general revenue, nor whether her failure to do so indicated an intention still to retain the power to redeem from the purchaser for general revenue purposes. There was no necessity for such a proceeding. She was entitled to the whole surplus, much or little, by virtue of the forfeiture, which was absolute.. In either case the full and complete title would pass to the vendee of the court.

The equitable right to this title had become vested in the complainant, Robinson, and he was entitled to the decree, which he, in fact, obtained.

Upon the whole case, let it be affirmed.