[No. B097359. Second Dist., Div. Four. Sept. 16, 1996.]

AMERICAN INTERNATIONAL BANK, Plaintiff and Appellant, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant and Respondent.

**COUNSEL**

Amil Roth for Plaintiff and Appellant.

Hawkins, Schnabel, Lindahl & Beck and Kelley K. Beck for Defendant and Respondent.

## OPINION

BARON, J.—This case presents an issue recently addressed by the Supreme Court in *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1 [44 Cal.Rptr.2d 370, 900 P.2d 619], "whether a commercial general liability insurer is required to defend a third party action that seeks incidental emotional distress damages caused by the insured's noncovered economic or business torts." (11 Cal.4th at p. 10.) In conformity with that decision, we conclude that the trial court herein properly found there was no coverage, no potential for coverage, and no duty to defend where the policy applies to "damages because of 'bodily injury' or 'property damage'. . . caused by an 'occurrence.' " We further conclude that substantial evidence supports the trial court's finding that the insurer conducted a reasonable investigation before declining coverage. Accordingly, the judgment is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and appellant American International Bank (AIB) was insured by defendant and respondent Fidelity and Deposit Company of Maryland (Fidelity). During the effective date of the policy, AIB was sued by Mike and Layla Boyajian. The complaint, as amended, alleged that the Boyajians had had a long-standing business relationship with AIB and a personal relationship with its president, James A. Dorian. In 1989, the Boyajians decided to build a new 12,000-square-foot "dream home" on property they had purchased in Laguna Beach. In December of 1989, the Boyajians and AIB entered into an oral contract for a $2.5 million construction loan. The terms of the agreement included provision for a loan fee of two points, an interest rate of two percentage points above prime, and terms extending six months after completion of construction. The loan was to be secured by a deed of trust on the Laguna Beach property. AIB agreed the Boyajians could draw on their existing credit line of $550,000 to cover preliminary expenses, and the Boyajians expended significant sums to pay for architectural and engineering work, and obtain permits from the City of Laguna Beach and Coastal Commission in reliance on obtaining the loan. AIB knew that if plaintiffs did not begin construction by August 1990, the Boyajians' coastal development permit would expire, and because of changes in zoning laws, would not be renewed. In July of 1990, the bank's loan committee met and offered a different loan which was contingent on a significant " 'cash injection' " from the Boyajians. The Boyajians rejected the alternative loan and, unable to

obtain financing elsewhere, were forced to give up on constructing their dream house.[1]

In the Boyajians' claim for breach of contract, they sought as damages the lost profit which could have been derived from the improvement of the property. Alternatively, the complaint alleged that the Boyajians would have sold the property in 1989 or 1990 had they known their construction loan would not be approved and lost the profit which could have been obtained from selling before the real estate market depreciated. In the second cause of action, based on promissory estoppel, they sought reimbursement of sums needlessly expended on preparing the property for construction. In a claim for bad faith denial of the existence of a contract, the complaint alleged unspecified damages. The Boyajians also asserted causes of action for fraud and negligent misrepresentation based on the bank's employees' promise that the bank would fund the loan on the terms originally stated. Here, they sought the same damages as for breach of contract. Finally, there were claims seeking compensation for intentional infliction of emotional distress and negligence leading to emotional distress. The claim for intentional infliction stated that the bank's behavior in encouraging the Boyajians to draw on their line of credit and keep their business with the bank was outrageous and caused the Boyajians "deep humiliation, mental anguish, and severe emotional distress . . . ." "Plaintiffs' humiliation, mental anguish and severe emotional distress included, but were not limited to, mental anguish and severe emotional distress caused by the realization that they would not be able to build the dream house they had been led to believe that they could construct, mental anguish and severe emotional distress at the realization that they had been misled in spending considerable moneys towards that dream house, mental anguish and emotional distress at the realization that if Defendants had told them at the beginning of their negotiations that the Bank would not provide a loan, they could have sought and obtained a loan from another source, thereby being able to build their dream house, and humiliation at having been treated in the above fashion by the Bank with which they had a long-standing relationship and by their long-time social acquaintance Dorian, and in having represented to their friends and social circle that they would be able to build their dream house, and then having to inform their friends that such construction could not take place."

---

[1]These facts were alleged in the complaint and proven at trial. In addition, the Boyajians established at trial that when it became clear that construction costs would exceed $2.5 million, the vice-president of AIB told the Boyajians that the bank could not loan more than $2.5 million, but promised to find a participating bank to loan them the necessary funds in excess of that amount. Ultimately, no other lender became involved and AIB refused to lend the $2.5 million, although they offered the loan for a lesser amount on less favorable terms which the Boyajians rejected.

The claim for negligence alleged that because of the long-standing relationship, defendants "had a legal duty to use due care in making representations and promises to Plaintiffs regarding a construction loan for construction of the House, in monitoring Plaintiffs' use of their Bank line of credit for funding preconstruction costs, and to inform Plaintiffs if the Bank was not going to fund the construction loan so that Plaintiffs could seek funding elsewhere." As a proximate cause of defendants' negligence, the Boyajians allegedly suffered "humiliation, mental anguish and severe emotional distress . . . ."

After trial to a jury, the Boyajians were awarded: $115,000 on the breach of contract claim; $350,000 on the promissory estoppel cause of action; $115,200 for negligence; and $10,000 for Layla Boyajian's emotional distress.

On appeal, Division Five of this court upheld the award of damages for breach of contract and promissory estoppel. The award for negligence was reversed because under that cause of action, the Boyajians had sought the identical damages as were awarded for breach of contract and promissory estoppel and there was no distinct and independent evidence of items of compensable damage flowing from the negligence theory of recovery. The court reversed the emotional distress damages on the grounds that they were not compensable in that the loss resulting from defendant's conduct was economic only. According to the court, "[w]hen the direct loss resulting from a defendant's merely negligent conduct is economic only, the consequential injury in terms of emotional distress is not compensable. . . . [¶] . . . Further, mere foreseeability that emotional distress might result from a defendant's negligent conduct is not sufficient to support the recovery of emotional distress damages; stated differently, a plaintiff cannot recover for negligent infliction of severe emotional distress based on a claim the defendant assumed a duty, arising out of a preexisting relationship, not to cause such psychic injury. . . . "

The trial in the AIB/Fidelity action was on stipulated facts and the court took judicial notice of the pleadings and findings of the court in the Boyajian matter. According to the stipulated facts, Fidelity insured AIB under a commercial package policy and an umbrella policy. In November of 1992, Fidelity was sent a copy of the amended complaint in the Boyajian litigation and understood that AIB was making a claim for coverage of the claims contained therein. One of Fidelity's employees reviewed and analyzed the pleading and the insurance policies. He concluded that there was no potential for coverage under the policy. That conclusion was affirmed by his superior,

and Fidelity sent a disclaimer letter to AIB's attorney. The letter requested any legal authority or further documentation which might affect the analysis. In December of 1993, AIB submitted copies of the special verdicts returned in the trial court. Fidelity's conclusion that there was no coverage remained unchanged.

The policy, attached to the stipulation of facts, stated: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. . . . The 'bodily injury' or 'property damage' must be caused by an 'occurrence.' " "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." "Occurrence" is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The coverage does not extend to " '[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured."

In its judgment and order, the trial court found that Fidelity's review of the complaint and the policy constituted an adequate investigation under California law. The court further found that the Boyajians' losses did not meet the definition of " 'property damage' " and their claims for " 'humiliation, mental anguish and severe emotional distress' " did not constitute " 'bodily injury' " as those terms are defined in the policy. In reaching the latter decision, the court relied in part on the decision in *Aim Insurance Co. v. Culcasi* (1991) 229 Cal.App.3d 209 [280 Cal.Rptr. 766]. There an employee of the insured brought suit because her employer had failed to forward her application for enrollment for medical insurance to the insurer. According to the complaint in *Culcasi*, the insured "negligently failed 'to properly complete her enrollment in the plan despite his assurances that she was so enrolled.' " (*Id.* at p. 213.) The insured tendered defense of the action to defendant Aim which had issued a liability insurance policy under which it agreed to " 'pay on behalf of [the insured] all sums which [he] shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies' " and to " 'defend any suit against [the insured] seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent[.]' " (*Id.* at p. 214.) The complaint did not sound only in contract but "clearly purport[ed] to state a cause of action for negligence, i.e., the breach of a duty of care." (*Id.* at p. 215.) The court in *Culcasi* held

that the term " 'bodily injury' . . . means physical injury and its consequences" and "does not include emotional distress in the absence of *physical* injury." (*Id.* at p. 220, original italics, fn. omitted.)

Relying on *Culcasi*, the trial court "conclude[d] the damages being sought do not potentially constitute 'bodily injury' or 'property damage' as defined in the . . . Policy." Because of this ruling, the trial court did not "decide the question of whether the Boyajian claim raises a potential for an 'occurrence' . . . ." AIB appealed from the judgment.

## DISCUSSION

### I

In its appeal, AIB contends that the provisions of the policy covering third party claims for "bodily injury" applies to the Boyajians' claims. AIB believes that this case is distinguishable from *Aim Insurance Co. v. Culcasi*, *supra*, 229 Cal.App.3d 209, relied on by the trial court, because in that case the underlying claimant did not seek to prove that the emotional distress led to physical injury whereas here Layla Boyajian testified that she suffered from heightened blood pressure after the loan deal fell through.[2] Although the Boyajians did not allege any physical injury in their complaint, the potential for such allegation was there, as AIB sees it, and, at the very least, Fidelity owed a duty to defend. We do not need to address that specific issue because, after the trial in this matter, and while the appeal was pending, the question of whether emotional *and physical* distress arising from economic losses is potentially covered by a policy which applies to bodily injury and damage to property caused by an accidental "occurrence" was resolved by the Supreme Court in *Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at pages 19-20.

In *Waller*, the policy under review covered " 'all damages which the insured becomes legally obligated to pay because of . . . bodily injury to any person, and . . . damage to property . . . to which this insurance applies, caused by an occurrence.' " (11 Cal.4th at p. 11.) Such language is the hallmark of a type of insurance policy commonly known as a "commercial" or "comprehensive" general liability policy, abbreviated as a CGL policy. (See *id.* at p. 10.) The policy in *Waller* defined bodily injury as " 'sickness or disease' " and property damage as " 'physical injury or destruction of tangible property.' " It defined " 'occurrence' " to be " 'an event,

---

[2]Whether or not this condition could be tied to the failure to fund the loan was apparently not resolved in the underlying action.

or series of events, including injurious exposure to conditions, proximately caused by an act or omission of the insured regardless of the number of persons, vehicles or objects affected by the act or omission which results, during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured.' " (*Id.* at p. 20.)

The claim in *Waller* involved a minority shareholder in a small corporation who had sued his fellow officers and directors (who were also the majority shareholders), claiming they had engaged in fraud and mismanagement. The underlying complaint included a cause of action for intentional infliction of emotional distress and alleged that the plaintiff had suffered " 'humiliation, mental anguish, and emotional and physical distress.' " (11 Cal.4th at p. 12.) The corporation forwarded the claim to its CGL insurer for defense of the officers and directors. The insurer decided that there was no potential for coverage and refused to defend. After the underlying lawsuit was resolved favorably to the defendants, they brought suit against the insurer for its failure to defend, recovering considerable bad faith and actual damages at the trial court level. On appeal, the Court of Appeal reversed the entire judgment, concluding that there was no potential for coverage because the underlying plaintiff's "alleged emotional and physical distress flowed from noncovered economic loss . . . ." (*Id.* at p. 15.) As explained by the court, " '. . . the [underlying] lawsuit sets forth nothing more than a business dispute; the torts alleged in the suit are all business and contract transgressions. Simply put, the gravamen of the [underlying] lawsuit is economic loss. In our view, the damages claim for emotional and physical distress is clearly derivative of and caused by the economic loss suffered by [the underlying plaintiff.]' " (*Ibid.*, quoting the Court of Appeal opinion.) The Supreme Court granted review to address "the recurring issue [of] whether a commercial general liability insurer is required to defend a third party action that seeks incidental emotional distress damages caused by the insured's noncovered economic or business torts." (*Id.* at p. 10.)

The Court of Appeal had relied on three cases which resolved the same or similar issues: *Keating* v. *National Union Fire Ins.* (9th Cir. 1993) 995 F.2d 154; *McLaughlin* v. *National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132 [29 Cal.Rptr.2d 559]; and *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846 [13 Cal.Rptr.2d 318]. The Supreme Court opinion undertook a lengthy analysis of these cases which for sake of convenience we repeat here: "In *Keating, supra,* the United States Court of Appeals for the Ninth Circuit addressed the issue whether, under California law, an insurer had a duty to defend its insureds against an investor action alleging that the insureds' conduct in committing securities fraud and other

related claims had caused the plaintiff investors to suffer economic damages that, in turn, resulted in their suffering from ' "emotional and physical distress, and impairment of health." ' (995 F.2d at p. 156.) The court held the insurer owed no duty to defend the underlying investor lawsuits because the alleged emotional and physical distress flowed from economic losses, which were not covered by the CGL policy and therefore did not give rise to a duty to defend." (*Waller* v. *Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at pp. 20-21.)

"In *Chatton*, several investors sued the directors and officers of Technical Equities, an investment services company, for fraud, negligent misrepresentation, breach of fiduciary duty and negligence. The investors prevailed on their negligence and fraud causes of action and were awarded damages for both their economic losses and resulting emotional distress, as well as punitive damages. Following their success at trial, the investors filed a declaratory relief action against the company's liability insurer to adjudicate coverage. The trial court held, among other things, that there was coverage under the bodily injury clause because the investors' emotional distress constituted 'bodily injury' under the CGL policy, and that the wrongful activities of Technical Equities (i.e., security manipulations, note fraud, etc.) were 'occurrences' within the meaning of the same policy. [¶] The Court of Appeal reversed, holding that any emotional distress suffered by the investors due to their economic losses was not covered by the liability policy even though those losses were caused by the negligent misrepresentations of Technical Equities officers and directors. [Citations.] This is so, the court held, because the 'bodily injury' clause under a CGL policy 'provides coverage for bodily injury to the person and for physical injury to, or destruction or loss of use of, *tangible property*.' (*Chatton, supra*, 10 Cal.App.4th at p. 857, some italics omitted.) Recognizing that the investors' emotional distress claims were 'predicated upon the "bodily injury" clause of the CGL policy,' the court concluded that the emotional trauma suffered by the investors was caused by investment or *intangible* economic losses which, in turn, were caused by the negligent misrepresentations of the Technical Equities officers. (*Id.* at p. 860.) The emotional trauma, the court concluded, fell outside the coverage clauses of the CGL policy. (*Id.* at p. 858.)" (*Waller* v. *Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at pp. 21-22.)

"[I]n *McLaughlin* [one issue] was whether the insurer had a duty to defend against an action alleging that the insureds' conduct had caused the investor plaintiffs to suffer economic damages and resultant mental, physical and emotional distress. [23 Cal.App.4th at p. 1150.] The *McLaughlin* court followed the reasoning of *Keating, supra*, 995 F.2d 154, and *Chatton, supra*,

10 Cal.App.4th 846, to reverse a multimillion-dollar, bad faith judgment against Technical Equities's insurer, National Union Fire Insurance Company of Pittsburgh, Pa., and to conclude the insurer owed no duty to defend under the bodily injury and property damage clauses because none of the damages sought was allowed under the CGL policy. [¶] The *McLaughlin* court observed, '[p]laintiffs' physical and emotional distress derived from their investment loss which in turn was negligently inflicted upon them by the insureds. First, the property damage coverage under the CGL extends only to physical injury to, or destruction or loss of use of, "tangible property." Damage for lost profits, loss of investment or other harm to one's economic interest constitute injuries to *intangible* property which by definition fall outside the scope of the [CGL] policy. (*Chatton, supra,* 10 Cal.App.4th at pp. 857-858.) [¶] Second, since [p]laintiffs' physical distress was induced by an uncovered economic loss it defies reason that bodily injury coverage would nevertheless independently obtain.' (*McLaughlin, supra,* 23 Cal.App.4th at p. 1150, italics in original.)" (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 22-23.)

Following its review of these three relevant authorities, the Supreme Court expressed agreement with the Court of Appeal that they had been properly decided and were controlling. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 23.) The key was not in the definition of "bodily injury," but in the definition of "occurrence" and the reasonable expectations of the parties. "[T]he CGL policy provides coverage for 'occurrences' that cause bodily injury or tangible property losses. [Citation.] These policies were never intended to cover emotional distress damages that flow from an uncovered 'occurrence,' and the parties could not reasonably have expected that coverage would be expanded merely because a claim of emotional or physical distress is alleged as a result of the economic loss. [Citation.] Accordingly, when we apply this rule to the present case and look to the allegations of the [underlying] complaint compared with the terms of [the] CGL policy, we conclude that [defendant] owed no duty to defend the [underlying lawsuit]. [Citation.]" (11 Cal.4th at p. 23.) "[T]he finding of no duty to defend in this context is consistent with the reasonable expectations of the parties when they enter into a contract for commercial general liability insurance, for it is widely understood by both insureds and insurers that such policies are not intended to cover economic losses. . . . [T]he damages alleged in [the underlying] complaint flowed from intangible property losses that could not be considered covered occurrences under the CGL policy. Likewise, the derivative emotional distress damages sought by [the underlying plaintiff] for the [insured's] alleged business torts were not covered because they flowed from the same noncovered acts. Any damages flowing from noncovered losses that may lead to emotional distress cannot be used to expand

coverage where none was intended or bargained for by the parties. [Citations.]" (11 Cal.4th at pp. 15-16.)

■ The decision of the Supreme Court in *Waller* is directly relevant because here, as in *Waller*, the occurrence or series of occurrences which gave rise to the Boyajians' losses damaged their economic interests, not their tangible property or their corporeal selves. Because of this economic injury, they suffered emotional distress, or so the jury found, and the emotional distress may or may not have had a physical manifestation—that fact was disputed at trial and not resolved by the special verdict. But the distinction would make no difference. As the Supreme Court explained in *Waller*: "[W]hen the third party complaint alleges emotional and/or physical distress flowing from economic losses—as was the case in *Chatton*, *Keating*, and *McLaughlin* as well as in the present lawsuit—the occurrence or event that causes damages is an economic loss. There is no separate 'bodily injury' occurrence within the terms of the policy. Thus, the injured party's claim that he suffered incidental emotional distress flows directly from the economic occurrence and, hence, is not covered by the CGL policy." (*Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 27.)

As the Supreme Court held, where the "occurrence" giving rise to the claim causes only economic loss, the fact that such intangible losses cause the victim to later suffer emotional distress and attendant physical injury cannot be used to convert an uncovered claim for economic loss into a covered claim for bodily injury. The occurrence itself must directly cause the bodily injury, the injury to tangible property, or the loss of use of the property. The Boyajians' physical distress, if any, derived from uncovered economic losses. Fidelity's policy "w[as] never intended to cover emotional distress damages that flow from an uncovered 'occurrence,' and the parties could not reasonably have expected that coverage would be expanded merely because a claim of emotional or physical distress is alleged as a result of the economic loss. [Citation.]" (*Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 23.)

II

■ AIB contends that whether or not Fidelity had a duty to indemnify, as an insurer it had a duty to thoroughly investigate AIB's claim before rejecting it. According to AIB, Fidelity breached its duty to investigate because it did no more than review the amended complaint and the policy (and later the special verdicts) and did not perform a full factual investigation. As we understand it, AIB believes that a failure to conduct a reasonable

investigation must result in imposition of liability on the insurer for defense costs whether or not a reasonable investigation would have revealed liability or potential for coverage.

AIB misunderstands the insurer's duty and the risk it runs if it fails to undertake an adequate investigation. ■ The risk that an insurer takes when it denies coverage without investigation is that the insured may later be able to prove that a reasonable investigation would have uncovered evidence to establish coverage or a potential for coverage. In that case, the insurer will be liable for the costs of defense already incurred by the insured (*Amato* v. *Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1793-1794 [23 Cal.Rptr.2d 73]) and could also be exposed to tort liability. (See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1995) Bad Faith, ¶ 12:674 et seq., pp. 12B-108 to 12B-111.)

■ More importantly, here there was no failure to investigate. The trial court expressly found that Fidelity's investigation was reasonable and that finding is supported by the evidence on the record. The evidence showed that Fidelity reviewed the Boyajians' complaint and the insurance policy. The duty of the insurer may be fully met by such a review. "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) The insurer is relieved of its duty to defend if the complaint "can by no conceivable theory raise a single issue which could bring it within the policy coverage." (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276, fn. 15 [54 Cal.Rptr. 104, 419 P.2d 168].) The Boyajians' complaint was for economic damages arising from a lost opportunity and emotional distress caused by their inability to build their dream home. It did not assert that the bank's conduct directly caused bodily injury or property damage. Thus, there was nothing to suggest a potential liability. As the trial court expressly found, this was a reasonable investigation under the circumstances.

AIB argues that there was a potential for liability because the Boyajians could have amended their complaint to assert, as they testified at trial, that the emotional injury had physical manifestations. As we have seen, under *Waller*, an allegation of physical injury would not have led to a different outcome on coverage.

Alternatively, AIB points out that the Boyajians recovered the cost of building a retaining wall on the property which later proved useless. According to AIB, the building of the wall constitutes physical damage to the

Boyajians' property under the policy definition and the Boyajians' inability to build their dream home constitutes loss of use of the Laguna Beach property.

As we have noted, the policy defined property damage to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property"; or "[l]oss of use of tangible property that is not physically injured." It is abundantly clear that construction of the retaining wall on the Boyajians' beachfront property did not damage the property; it was an "improvement" as that term is usually defined: "A valuable addition made to property (usually real estate) or an amelioration in its condition, . . . costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." (Black's Law Dict. (6th ed. 1990) p. 757, col. 2.) "All works which are directed to the creation of homes for families, or are substantial steps towards bringing lands into cultivation, have in their results the special character of 'improvements,' and under the land laws of the United States and of the several states, are encouraged." (*Simpson* v. *Robinson* (1881) 37 Ark. 132, 137.) We refuse to hold that by improving their property, and rendering it amenable to construction when fortune and zoning conditions change, the Boyajians damaged it.

Likewise, their inability to construct a dream home was not physical damage to the property, it was an inability to make "[a] valuable addition . . . intended to enhance [their property's] value . . . ." (Black's Law Dict., *op. cit. supra*, at p. 757, col. 2.) Just as the construction of an unnecessary improvement is a solely economic event, the inability to construct an improvement results in only economic loss. And "strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy. [Citations.]" (*Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 219 [169 Cal.Rptr. 278].)

III

At oral argument, AIB stressed that the Boyajians' complaint purported to state a claim for negligence and not just negligent infliction of emotional distress, apparently under the misapprehension that all claims for negligence must at least potentially come within the policy and therefore give rise to a duty to defend. That is not so. As we have noted, the policy covers bodily injury or property damage caused by an "occurrence," defined

as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" but not where the bodily injury or property damage is "expected or intended from the standpoint of the insured." "Negligent" and "accidental" are not synonymous as the court pointed out in *Chatton* v. *National Union Fire Ins. Co., supra*: "In its plain, ordinary sense, 'accidental' means ' "arising from extrinsic causes[;] occurring unexpectedly or by chance[; or] happening without intent or through carelessness." ' " (10 Cal.App.4th at p. 860.) The court went on to hold that ". . . negligent misrepresentations causing investment loss or loss of other economic interest are considered purposeful rather than accidental for the purpose of insurance coverage." (*Id.* at p. 861) The *Chatton* court was persuaded by the reasoning of *Safeco Ins. Co. of America* v. *Andrews* (9th Cir. 1990) 915 F.2d 500, where, in concluding that an insurer had no duty to defend, the Ninth Circuit stated: "Kuehl is seeking damages for Andrews's alleged negligence in failing to inspect and inform him of defects in the property and for misrepresentation 'materially affecting the value or desirability' of the property. Kuehl's claims do not expose Andrews to liability for any damage to tangible property, but rather for economic loss resulting from Andrews's alleged failure to discover and disclose facts relevant to the property's value and desirability. Such harm is outside the scope of the policy. [Citation.] Although the defective condition of the property is an element of Kuehl's claims, the defects cannot, even when interpreting the policy broadly, be considered the *cause* of Kuehl's damages. The cause of the damage was Andrews's alleged misrepresentations, which are not an 'occurrence' or a 'peril insured against' under the terms of the policy. There is, therefore, no potential for liability that arguably comes within the scope of the insurance coverage provided by Safeco." (915 F.2d at p. 502.)

The analysis applies equally here. The Boyajians' negligence cause of action stated that "Defendants had a legal duty to use due care in making representations and promises to Plaintiffs regarding a construction loan for construction of the House, in monitoring Plaintiffs' use of their Bank line of credit for funding preconstruction costs, and to inform Plaintiffs if the Bank was not going to fund the construction loan so that Plaintiffs could seek funding elsewhere." It was these alleged misrepresentations and failures to disclose that purportedly caused the losses suffered by the Boyajians. The described conduct was not an occurrence under the policy definition because the results were not unintended or unexpected as they would be in the case of a true accident. Therefore, there was no insured against occurrence and no reason for Fidelity to suspect that one existed.

IV

■ AIB contends the policy should be read to cover the Boyajians' claim because under section II, entitled "Who Is An Insured," the policy states: "If you are designated in the Declarations as: [¶] . . . . [¶] . . . An organization other than a partnership or joint venture, you are an insured. *Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors.*" (Italics added.) AIB's president, Dorian, and another officer made the promises on which the Boyajians relied, and were accused of negligence in the complaint.[3] AIB argues that since the complaint was based on acts and omissions of these officers, the policy reference to officers and directors and their "duties as your officers or directors" must result in coverage. According to AIB, its position is strengthened by the fact that an umbrella policy, also issued by Fidelity, expressly excludes " 'injury arising out of the rendering or failure to render any professional services' " and " 'any claim arising out of any error or omission or a mistake committed by you or on your behalf in the conduct of your business activities,' " while the main policy contains no such exclusion.

We do not agree with AIB's analysis. By its express terms, the quoted provision offers a description of who is covered and does not purport to expand the scope of coverage. If in the performance of their duties the officers and directors of AIB caused an "occurrence" which led to "bodily injury" or "property damage," as those terms are defined in the policy, then AIB is covered. That is the plain and only meaning that can be ascribed to the provision. It did not transform the policy into professional liability insurance. "Had these insureds desired to obtain a professional liability policy to protect them from charges resulting from the performance of professional services, such insurance could have been obtained. The premium would likely have been higher than the $317 annual premium charged here for general business liability insurance. But the insurer who issues a policy for errors and omissions insures against a far different risk than that insured against here. More important, just as an insurer would not reasonably expect that a business liability policy would cover claims for securities fraud, these insureds could not reasonably expect that such claims would be covered under this policy." (*Allstate Ins. Co.* v. *Interbank Financial Services* (1989) 215 Cal.App.3d 825, 831 [264 Cal.Rptr. 25].)

Turning to AIB's other point, the lack of an express exclusion in the policy has no significance unless the description of the scope of coverage

---

[3]The individual defendants were voluntarily dismissed by the Boyajians in 1993.

can be read to include " 'injury arising out of the rendering or failure to render any professional services' " or " 'any claim arising out of any error or omission or a mistake committed by you or on your behalf in the conduct of your business activities' " in the absence of such exclusions.

■ "[B]efore even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms]." (*Hallmark Ins.* Co. v. *Superior Court* (1988) 201 Cal.App.3d 1014, 1017 [247 Cal.Rptr. 638].) "[W]hen an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded." (*Glavinich* v. *Commonwealth Land Title Ins. Co.* (1984) 163 Cal.App.3d 263, 270 [209 Cal.Rptr. 266].) As we have seen, the coverage provisions cannot be read to cover directors' and officers' errors and omissions which lead to economic losses. Therefore, the lack of an exclusion clause is irrelevant.

### DISPOSITION

For all the foregoing reasons, the judgment is affirmed.

Vogel (C. S.), P. J., and Aranda, J.,* concurred.

A petition for a rehearing was denied October 2, 1996, and appellant's petition for review by the Supreme Court was denied December 11, 1996.

---

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.