Filed 7/25/13  Shelton v. Fire Ins. Exchange CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ALDA SHELTON et al.,<br><br>        Plaintiffs and Appellants,<br><br>        v.<br><br>FIRE INSURANCE EXCHANGE,<br><br>        Defendant and Respondent. | B240775<br><br>(Los Angeles County<br>Super. Ct. No. SC111083) |

        APPEAL from a judgment of the Superior Court of Los Angeles County.  Craig D. Karlan, Judge.  Reversed.

        The Law Office of Alda Shelton and Alda Shelton for Plaintiffs and Appellants.

        Stone & Hiles and David L. Schaffer for Defendant and Respondent.

————————

We are asked to determine whether an insurer has a duty to defend its insureds who are sued by a neighbor for emotional distress damages, including bodily injury, based on the insureds' maintaining trees and a hedge "in excess of six feet" on the insureds' rental property. Alda Shelton and Jon Sherman (collectively, plaintiffs) appeal from a judgment entered after the trial court granted a motion for summary judgment of Fire Insurance Exchange (Exchange) against plaintiffs' complaint for declaratory relief, bad faith breach of insurance contract, and breach of contract. Plaintiffs contend that the court erred in granting summary judgment because Exchange had a duty to defend plaintiffs against the neighbor's claim that she allegedly had suffered bodily injury arising from emotional distress resulting from "continuous and repeated exposure to the same condition"—the untrimmed foliage and resulting blind intersection—caused by plaintiffs' negligent acts. Plaintiffs also contend that Exchange had a duty to defend even against a meritless suit. We agree because a triable issue of material fact exists as to whether there is a potential for coverage. Accordingly, we reverse the judgment.

## BACKGROUND

### A. The policy

Exchange issued to plaintiffs a "Landlords Protector Package" policy covering the insured rental property located in Malibu, California, from January 16, 2010, to January 16, 2011 (policy). The policy included business liability coverage with a stated limit of $1 million for each occurrence. The policy provided, "We shall pay all damages from an **occurrence** which an **insured** is legally liable to pay because of **bodily injury**, personal injury, or **property damage** arising out of the ownership, maintenance, or use of the **insured location** covered by this policy. [¶] At our expense we shall defend an **insured** against any covered claim or suit." An occurrence was defined as "a sudden event, including continuous or repeated exposure to the same condition, resulting in **bodily injury** or **property damage** neither expected nor intended by the **insured**. It also means an act or series of acts of the same or similar nature, resulting in **personal injury**." Bodily injury was defined as "bodily harm, sickness or disease, including care, loss of

2

services and death resulting from the injury." Property damage was defined as "physical injury to or destruction of tangible property including loss of its use." The policy also contained an intentional acts exclusion, which stated in part, "We do *not* cover **bodily injury, personal injury** or **property damage:** [¶] . . . [¶] 7. Arising from any **occurrence** caused by an intentional act of any **insured person** where the results are reasonably foreseeable."

## B. The Kalcheim complaint

On July 14, 2010, Bonnie Kalcheim, individually and as trustee of a family trust, filed a complaint against Shelton, alleging causes of action for breach of covenants running with the land, private nuisance, and public nuisance (Kalcheim complaint). The Kalcheim complaint alleged as follows.

Title 22 of the Los Angeles County Code provided that "[f]ences and walls within a required corner side yard shall not . . . exceed six feet in height where five feet or more from said highway line." (L.A. County Code, § 22.48.160.)~ (CT 82, 170)~ The Los Angeles County Code further stated that "'height restrictions applying to fences and walls shall also apply to hedges planted within yards and forming a barrier serving the same purpose as a fence or wall.'" (L.A. County Code, § 22.48.170.) The neighborhood in which Shelton's property was located was developed in 1962 and is governed by covenants, conditions, and restrictions (CC&R's) recorded the same year. The 1962 CC&R's (1962 CC&R's) provided that fences shall not exceed six feet in height and hedges shall not exceed five feet in height and that fences, plants, or hedges shall not "'interfere with ocean views enjoyed by adjacent lots.'" A 2004 amendment and restatement of the CC&R's (2004 CC&R's) similarly limited fence height to six feet and hedge height to five feet but also provided that "'no trees, fences, plants, hedges, or any other structures or devices may be placed or maintained on any lot or any part thereof if the placement or maintenance thereon will interfere with ocean views enjoyed by other lots in the same Tract or lots in a contiguous Tract.'" Shelton's property was located on a corner lot and "ha[d] a tall, dense hedge and trees wrapping around the property that

3

create[s] a blind corner for automobile drivers at the intersection." "Shelton . . . negligently allowed the trees and hedge on the Shelton Property to grow to violate Title 22, the 1962 CC&Rs and the 2004 CC&Rs, but now consciously maintained the Shelton Property in knowing violation [of] them." "[Kalcheim] and others asked, or tried to ask, [Shelton] to trim the trees on Shelton Property so that [Kalcheim] and her terminally sick daughter could enjoy the ocean view together." Shelton "maliciously and despicably called names and spewed obscenities at one or more people who requested that they cut the ficus hedge and/or other trees on their property."

As to the cause of action for public nuisance, the Kalcheim complaint alleged "the hedge and trees are a public nuisance per se under Civil Code section 3479 because they unlawfully obstruct[] the free use, in the customary manner," of public roads and ingress and egress from the Kalcheim property. The hedge and trees "are in excess of height restrictions within Title 22" and cause a specific injury to Kalcheim by interfering with sightlines from the street to the Kalcheim property. Kalcheim and others had given notice to Shelton of the damages caused by the nuisance and requested abatement, but Shelton refused to abate the nuisance.

As to the cause of action for private nuisance, Shelton maintained the hedge and trees "in a manner that creates an unreasonable, dangerous condition in violation of Title 22 and an unreasonable interference" with Kalcheim's view rights under the CC&R's. Shelton's actions "constitute nuisances within the meaning of Section 3479 of the Civil Code as an interference with the comfortable enjoyment of the Kalcheim property." Kalcheim and others repeatedly gave notice to Shelton of the damages caused by the nuisance and requested their abatement, but Shelton refused and continues to refuse to abate the nuisances.

As to the cause of action for breach of covenants running with the land, Shelton and Kalcheim "held express contractual obligations and an implied covenant of good faith and fair dealing between them" under the CC&R's. Shelton "breached the express

4

obligations and the implied covenant of good faith and fair dealing owed to [Kalcheim]" by placing and maintaining trees and the hedge in violation of the CC&R's.

As to all causes of action, Kalcheim suffered "annoyance, inconvenience, discomfort, and interference with her rightful use and enjoyment of the Kalcheim Property constituting damages in an amount not yet known but to be determined according to proof."

A statement of damages was served in connection with the Kalcheim complaint, claiming $300,000 in emotional distress damages and $1 million in punitive damages. Sometime later, Kalcheim added Sherman as a defendant.

## C. The tender of defense by plaintiffs and rejection by Exchange

On July 23, 2010, plaintiffs notified Exchange of the Kalcheim complaint and requested defense and indemnification from Exchange.

On September 2, 2010, Exchange recorded a statement by Shelton.

On November 19, 2010, Exchange sent a letter to plaintiffs, stating that it had completed its investigation and determined it had no duty to defend or indemnify plaintiffs because "[t]he claim for your refusal to cut back the foliage on your property does not meet the definition of an 'occurrence' which is defined to mean a sudden event that results in bodily injury or property damage neither expected or intended by you. . . . [¶] . . . The referenced policy only provides coverage for bodily injury caused by an occurrence. The Policy was not intended to cover emotional distress damages that flow from an uncovered claim . . . . Since the claims asserted do not meet the definition of bodily injury, personal injury or property damage caused by an occurrence, the claims do not meet the insuring agreement of the Policy and no coverage is available under the Policy. [¶] . . . To the extent you intended or expected to cause injury or damage, [Insurance Code] Section 533 would be an additional basis to preclude indemnity coverage for those claims."

On January 10, 2011, plaintiffs wrote a letter to Exchange noting that the policy covers claims for bodily injury and property damage caused by "continuous or repeated

5

exposure to the same condition, resulting in bodily injury . . . neither expected nor intended by the insured." Plaintiffs argued that Exchange was required to defend plaintiffs because Kalcheim alleged she had suffered emotional distress as well as property damage and loss of use of her property arising from "continuous and repeated exposure to the blind corner, allegedly caused by the foliage," which was caused by plaintiffs' negligence and nonfeasance, rather than intentional acts. In a letter dated January 19, 2011, Exchange reaffirmed its prior denial on the same grounds and additionally stated that the Kalcheim complaint "contains no allegations of physical injury to property" and therefore does not state a covered claim.

## D. The Shelton complaint

On January 18, 2011, plaintiffs filed a complaint against Exchange for declaratory relief, bad faith breach of insurance contract, and breach of contract (Shelton complaint). The Shelton complaint alleged as follows. As to the cause of action for declaratory relief, beginning in 2000, plaintiffs and Exchange had entered into a yearly policy of insurance covering plaintiffs' insured property. Kalcheim had filed a complaint against Shelton for private nuisance and public nuisance, alleging that the insured property contained a tree and bushes that created a dangerous condition and seeking emotional distress damages and property damages. Thereafter, Kalcheim had added Sherman to the complaint. On November 19, 2010, Exchange refused to defend plaintiffs and denied coverage. Plaintiffs requested a declaration of the rights and duties of the parties under the policy and an award of damages and possible indemnification based on Exchange's failure to provide a defense and coverage.

As to the cause of action for breach of the implied covenant of good faith and fair dealing, the Shelton complaint alleged that Exchange's "failure to defend and denial of coverage is a breach of good faith and fair dealing." Exchange wrongfully sent a letter to Kalcheim's attorney, stating that Sherman was a named insured, resulting in Kalcheim adding Sherman as a defendant. Exchange then wrongfully denied Sherman coverage. Plaintiffs defended against the Kalcheim complaint. As to the breach of contract cause of

action, "[i]n failing to defend and to provide the benefits of the coverage paid for by plaintiffs," Exchange breached the contract of insurance between Exchange and plaintiffs.

## E. The Kalcheim first amended complaint

On March 14, 2011, Kalcheim filed a first amended complaint, adding as coplaintiffs Philip George, individually and as a trustee of a family trust, and Jack A. Panaro, who lived with Kalcheim (FAC).[1] The FAC alleged causes of action for public nuisance, private nuisance, breach of covenants running with the land, and breach of equitable servitudes. The FAC essentially repleaded the allegations of the Kalcheim complaint with the exception that the FAC alleged that George owned real property within the housing tract and was also affected by plaintiffs' wrongful conduct, and that plaintiffs "intentionally" rather than "negligently" "allow the trees and hedge on the Shelton Property to violate Title 22 and the 1962 CC&Rs and the 2004 CC&Rs." As to the cause of action for breach of covenants running with the land, the FAC added the allegation that the CC&R's gave rise to covenants running with the land. The FAC added the cause of action for breach of equitable servitudes, alleging that plaintiffs "breached the obligations and also the implied covenant of good faith and fair dealing owed to [Kalcheim] through the Equitable Servitudes" that "exist . . . due to" the CC&R's by placing and maintaining trees and the hedge in violation of the CC&R's.

A statement of damages was served in connection with the FAC, claiming $300,000 in emotional distress damages and $1 million in punitive damages.

## F. Plaintiffs' May 9, 2011 letter

On May 9, 2011, plaintiffs wrote a letter to Exchange, requesting that it reconsider its denial of a duty to defend plaintiffs against the FAC. Plaintiffs asserted that the FAC gave rise to bodily injury claims, because on May 5, 2011, Kalcheim testified in

---

[1] Although the FAC contained in the record does not show a file stamp date, it was signed by Kalcheim's counsel on March 10, 2011, and Exchange claims in its brief that it was filed on March 14, 2011. Kalcheim, George, and Panaro are not parties to this appeal.

deposition that her "repeated and continuous exposure to the public nuisance" caused her to suffer stress, which "in turn helped cause diverticulitis, a stress-related condition in the intestines. [Kalcheim] had to have a 9" section of her colon removed surgically to repair the stress-caused problem." Kalcheim testified that "[d]ue to the occurrences alleged in the complaint, she has suffered headaches, for which she took aspirin; and stomach pains, for which she took antacids. She suffered a loss of appetite and could not sleep." And Panaro claimed to have suffered stiff muscles as a result of the stress caused by continuous exposure to the "conditions" on Shelton's property. On May 31, 2011, plaintiffs sent Exchange another letter attaching excerpts from Kalcheim's deposition transcript and stating that Kalcheim claimed she had suffered "a mitral valve prolapse, and that 'stress is one of the elements of it.'" On July 7, 2011, Exchange reaffirmed its denial.

### G. The motion for summary judgment

On September 23, 2011, Exchange filed a motion for summary judgment, asserting that the FAC's claims against plaintiffs did not fall within the policy's liability coverage because plaintiffs' refusal to reduce the height of the hedge and trees did not qualify as an occurrence in that the FAC did not allege a sudden event; plaintiffs' actions were intentional and could not "satisfy the definition's requirement that [the] conduct be 'neither expected nor intended'"; the emotional distress claims did not qualify as bodily injury; the emotional distress claims flowed from an intangible property loss which was not covered; and the policy's intentional acts exclusion provision and Insurance Code section 533 barred coverage. Exchange also argued that because its interpretation of the policy was reasonable, plaintiffs' cause of action for bad faith was without merit.

Shelton's recorded statement was attached to Exchange's motion for summary judgment. In her recorded statement, Shelton stated that neither Kalcheim nor others had ever asked her to cut, trim, or remove the hedge. Shelton stated that Kalcheim had never talked to her other than "once in about 1985 when her car ran into my fence." Shelton also stated that the tenants employed their own gardener, Shelton's own workers trim the

8

trees once a year, and she did not know whether Kalcheim had ever approached her tenants. The workers had trimmed the trees around January 2010 when the current tenants had moved in.

In opposition to the motion for summary judgment, plaintiffs argued that Exchange had a duty to defend plaintiffs against claims of bodily injury allegedly arising from emotional distress resulting from "continuous and repeated exposure to the same condition"—the untrimmed foliage and resulting blind intersection caused by plaintiffs' negligent acts. In support of the opposition to Exchange's motion for summary judgment, plaintiffs attached Shelton's declaration; plaintiffs' May 31, 2011 letter to Exchange; excerpts from Kalcheim's deposition taken on May 6, 2011; and excerpts from Kalcheim's responses to interrogatories.

Shelton's declaration stated that Exchange's claims agent did not ask Kalcheim's counsel whether Kalcheim was "alleging emotional distress with physical manifestations." Shelton also declared that she "did not foresee that not trimming my plants to suit [Kalcheim] would cause emotional distress nor did I intend to cause distress. I was unaware of their claims until a few days before they filed suit. I trimmed my oleanders down [to] the fence line only 2 days after I received their letter threatening lawsuit, but that did not placate them." She declared that the hedge and trees do not create a blind intersection and do not hinder Kalcheim's and George's ingress and egress to their driveways; and the "CC&R's are not applicable, for they only potentially grant a view easement to adjacent properties, and the 2 properties at issue are between 60 and 100 feet away from mine, and separated by a street."

Kalcheim testified in deposition that the blind spot caused by the hedge caused her emotional distress because "[e]very time I pull out the car, every time [my husband] pulls out of the driveway, I'm worried." Kalcheim further testified that due to the foliage blocking her ocean view, she became stressed, angry, depressed, frustrated, and suffered sleep and appetite problems. Kalcheim had "surgery to remove nine inches of my colon from a severe case of diverticulitis which perforated my colon and went into my ovaries

and the rest of my body, and it was suggested at the time that it certainly could have been brought on by stress." She took aspirin for headaches and antacid medication for her upset stomach. She also had a mitral valve prolapse and believed that "[s]tress is one of the elements of it." In her response to interrogatories, Kalcheim stated that her damages included "[e]motional distress including without limitation, frustration, anxiety, anger, and disappointment, causing physiological symptoms, including, but not limited to, depression and sleeplessness."

In their opposition, plaintiffs cited Shelton's recorded statement in which she stated that Kalcheim had never asked her to trim the foliage, Shelton trimmed the trees every year, and Shelton had trimmed the oleanders down to the fence line in July 2010. Plaintiffs argued that Exchange had not "proven that plaintiffs intended to cause harm."

The trial court granted Exchange's motion for summary judgment, holding, "Since the Kalcheim complaint is predicated only on allegations of intentionally wrongful conduct by [plaintiffs], causing her severe emotional distress, none of the damages asserted by Ms. Kalcheim arise from an accidental 'occurrence' within the meaning of the insuring clause." The court noted, "Whether emotional distress accompanied by physical manifestations, illness and/or injury qualifies as 'bodily injury' raises an ambiguity that should be resolved in favor of the insured. (See *Employers Cas. Ins. Co. v. Foust* (1972) 29 Cal.App.3d 382 [coverage for bodily injury in an automobile liability insurance policy applies to emotional distress sustained by an accident victim's mother, who suffered shock and emotional distress resulting in physical injury when she witnessed the victim being struck by the insured's automobile].)" The court found that "[t]here is no dispute in the parties' evidence that Ms. Kalcheim provided discovery responses in the underlying action stating that her emotional distress did result in physical injury and illness—including appetite problems and sleeplessness, diverticulitis resulting in the removal of 9 inches of colon, headaches and upset stomach and a mitral valve prolapse," and there was no basis to adjudicate the "'bodily injury'" issue in favor of Exchange. But the court stated such a finding was "superfluous to the court's analysis

10

and findings above regarding 'occurrence' and below regarding the intentional acts exclusion." The court also determined that the intentional acts exclusion of the policy and Insurance Code section 533 barred coverage because, "[v]iewed in conjunction with the 'occurrence' analysis, the court finds that the undisputed facts support a finding that plaintiffs' actions do not fall within the 'neither expected nor intended' language of the policy." Judgment was entered and this appeal followed.

## DISCUSSION

### A. Standard of review

"'It is by now a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] . . . "the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.] [¶] The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citation.]' (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081, original italics.) The insurer is relieved of its duty only where 'the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' [Citation.] Any doubt as to whether the insurer has a duty to defend is resolved in the insured's favor. (*Horace Mann Ins. Co. v. Barbara B.*, *supra*, 4 Cal.4th at p. 1081.)" (*Maryland Casualty Co. v. National American Ins. Co.* (1996) 48 Cal.App.4th 1822, 1830–1831.)

"*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287 (*Montrose I*), explains the parties' burdens of proof in a declaratory relief action regarding the duty to defend. 'To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the

11

insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*. Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages . . . will fall within the scope of coverage, therefore add no weight to the scales. Any seeming disparity in the respective burdens merely reflects the substantive law.' (*Id.* at p. 300, original italics.)" (*Maryland Casualty Co. v. National American Ins. Co.*, *supra*, 48 Cal.App.4th at p. 1831.)

"Once a prima facie showing is made that the underlying action fell within coverage provisions, an insurer may defeat a motion for summary judgment only by producing undisputed extrinsic evidence conclusively eliminating the potential for coverage under the policy. (*Montrose I*, *supra*, 6 Cal.4th at pp. 298–299.) Evidence that merely 'placed in dispute whether [the insured's] actions would eventually be determined not to constitute an occurrence or to fall within one or more of the exclusions contained in the policies' is insufficient to defeat the insured's right to summary judgment. (*Id.* at p. 304.)" (*Maryland Casualty Co. v. National American Ins. Co.*, *supra*, 48 Cal.App.4th at p. 1832).

**B. A triable issue of material fact exists as to whether there is a potential for coverage**

Plaintiffs contend that the court erred in granting summary judgment because Exchange had a duty to defend plaintiffs against the neighbor's claim that she allegedly had suffered bodily injury arising from emotional distress resulting from "continuous and repeated exposure to the same condition"—the untrimmed foliage and resulting blind intersection caused by plaintiffs' negligent acts. Plaintiffs also contends that Exchange had a duty to defend even against a meritless suit. We agree because a triable issue of material fact exists as to whether there is a potential for coverage.

We first examine the allegations of the FAC. The FAC alleged causes of action for public nuisance, private nuisance, breach of covenants running with the land, and breach of equitable servitudes.

12

According to Civil Code section 3479, "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance." "A public nuisance is one 'which "affects at the same time an entire community or neighborhood, or any considerable number of persons."' [Citation.]" (*Kempton v. City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1348.) "A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." (Civ. Code, § 3493.) "Interference with the ingress and egress to and from a public street constitutes 'both a private and a public nuisance' and may constitute a special injury actionable by an individual." (*Kempton*, at p. 1349.)

California requires "the following elements for a covenant to run with the land: (1) the instrument containing the covenant must describe both the dominant estate and the servient estate; (2) the instrument must expressly provide that all successive owners of the servient estate are to be bound by the covenant, and the deed must refer to the recorded restrictions to show the intent of the parties that the covenant run with the land; (3) each act required by the covenant must relate to the use, repair, maintenance, or improvement of, or payment of taxes and assessments on, the land described; (4) the instrument containing the covenant must be recorded in the office of the county recorder of the county where the land is situated." (*In re Snow* (Bankr. C.D.Cal. 1996) 201 B.R. 968, 972; Civ. Code, § 1468.)

"An equitable servitude arises where one or more of the requirements of a covenant running with the land are not met, but the following conditions are met: (1) the subsequent owner of the servient estate has notice of the covenant; (2) the holder of the servitude is seeking equitable relief only (as opposed to a remedy at law); and (3) it is

13

inequitable to deny the enforcement of the servitude." (*In re Snow*, *supra*, 201 B.R. at pp. 972–973.)

The FAC alleged that the hedge and trees are a public nuisance under Civil Code section 3479 because they obstructed the free use of public roads and ingress and egress from the Kalcheim property, exceeded the height restrictions of the Los Angeles County Code, and caused a specific injury to Kalcheim by interfering with sightlines from the street to the Kalcheim property. The FAC alleged that the hedge and trees were a private nuisance under Civil Code section 3479 because they created an unreasonable, dangerous condition and an unreasonable interference with Kalcheim's view rights. The FAC alleged that plaintiffs' maintenance of the hedge and trees breached express obligations and the implied covenant of good faith and fair dealing "through equitable servitudes" under the CC&R's.

We next examine the terms of the policy, keeping in mind that "interpretation of an insurance contract, like any contract, is governed by the mutual intent of the parties at the time they form the contract. [Citation.] The parties' intent is found, if possible, solely in the contract's written provisions. [Citation.] 'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' [Citation.] Thus, if a layperson would give the contract language an unambiguous meaning, we apply that meaning. [Citation.] Only these basic principles are needed to interpret contract language that is clear and unambiguous. [¶] The rules for recognizing ambiguity are also straightforward. Ambiguity exists when an insurance policy provision is susceptible to two or more constructions that are reasonable and not based on strained interpretations. [Citation.] Contract language interpretation involves considering the whole instrument and the circumstances of the case; ambiguity is not an abstract question. [Citation.] . . . [¶] When particular policy language is ambiguous, it is interpreted in the sense the insurer believed the insured understood it at the time of formation. [Citation.] If that principle

cannot remove an ambiguity, as when there is no basis for a belief that the insured understood a term in a specific sense, then the ambiguity is construed against the party who caused the uncertainty to exist." (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 736–737 (*Shell Oil*).)

The policy stated, "We shall pay all damages from an **occurrence** which an **insured** is legally liable to pay because of **bodily injury**, personal injury, or **property damage** arising out of the ownership, maintenance, or use of the **insured location** covered by this policy.  [¶]  At our expense we shall defend an **insured** against any covered claim or suit."  An occurrence was defined in the policy as "a sudden event, including continuous or repeated exposure to the same condition, resulting in **bodily injury** or **property damage** neither expected nor intended by the **insured**.  It also means an act or series of acts of the same or similar nature, resulting in **personal injury**."  The policy defined property damage to mean "physical injury to or destruction of tangible property including loss of its use."

Thus, we must determine whether the hedge and trees that allegedly blocked Kalcheim's ocean view, created a blind intersection, and interfered with Kalcheim's driveway sightlines was "a sudden event, including continuous or repeated exposure to the same condition . . . ."  "[I]n standard pre-1986 policies, ['occurrence'] was defined as an 'accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.'  Although more recent policies . . . have replaced the term 'accident' with 'event' (to include gradual events within the concept of accident), the phrase 'neither expected nor intended' focuses coverage on *unexpected* or *accidental injuries* that are fortuitous and not planned or intended.  This concept of fortuity is basic to insurance law." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16–17 (*Waller*).)

In *Shell Oil*, the Court of Appeal noted that "'including' is a word of enlargement." (*Shell Oil*, *supra*, 12 Cal.App.4th at p. 749.)  Thus, a change in the terms of the policy "from 'accident, or' to 'accident, including' . . . ¶ . . . [enlarged] the

15

meaning of 'accident' to add exposure to damaging conditions; gradual events can then be 'accidents' and 'occurrences' under the policies. This change broadened the scope of covered events because some courts required that 'accidents' be 'sudden.'" (*Id.* at pp. 748–749.) And the court held that the use of the term "sudden" in a jury instruction "did not preclude coverage for an 'occurrence' that was gradual and not abrupt in nature." (*Id.* at p. 751.) "The 'occurrence' definitions therefore encompassed both sudden and gradual events." (*Id.* at p. 752.)

Here, the policy defined occurrence as "a sudden event, including continuous or repeated exposure to the same condition . . . ." Under *Shell Oil*, the policy's definition of occurrence included gradual events that are not abrupt in nature. Because the FAC alleged the event to be the growth of the hedge and trees, which by nature are gradual events, we conclude the FAC alleged an occurrence within the meaning of the policy.

We next decide whether the "sudden event, including continuous or repeated exposure to the same condition"—the trees and hedge— resulted in "**bodily injury** or **property damage** neither expected nor intended by the **insured**." As defined in the policy, bodily injury is "bodily harm, sickness or disease, including care, loss of services and death resulting from the injury." *Chatton v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846 states that "[t]he bodily injury clause in the [comprehensive general liability] policy has been interpreted on numerous occasions. The cases overwhelmingly hold that the phrase 'bodily injury, sickness or disease' is plain and unambiguous and that coverage under the bodily injury clause is limited to physical injury to the body and does not include nonphysical, emotional or mental harm." (*Id.* at p. 854.) But "bodily injury includes physical injury resulting from emotional distress." (*Id.* at p. 857.)

As the trial court noted, it was undisputed that Kalcheim had provided discovery responses stating that her emotional distress resulted in physical injury and illness, including appetite problems and sleeplessness, headaches, upset stomach, a mitral valve prolapse, and diverticulitis resulting in the removal of nine inches of colon. And Panaro claimed stress-related stiff muscles caused by the continuous exposure to the conditions

16

on plaintiffs' property. But Exchange argues that "the policy defines 'bodily injury' as 'bodily harm, sickness or disease, including care, loss of service and death *resulting from the injury*.' (Emphasis added.) Thus, under the definition's plain meaning, the claimant's bodily harm, sickness, or disease, *including* its physical manifestations, must be the result of a *bodily* injury, not an emotional distress injury." Exchange urges that in order for plaintiffs' claim to be covered under the policy, Kalcheim had to allege that she "suffered physical injury as a result of being struck by plaintiffs' foliage." While Exchange's interpretation may be reasonable, so is the interpretation of plaintiffs, that because "Kalcheim asserted bodily injury arising from her emotional distress, bodily injury was present, and coverage is triggered. No touching or physical contact is required." We agree with the trial court that "[w]hether emotional distress accompanied by physical manifestations, illness, and/or injury qualifies as 'bodily injury' raises an ambiguity that should be resolved in favor of the insured." As stated, "the ambiguity is construed against the party who caused the uncertainty to exist." (*Shell Oil*, *supra*, 12 Cal.App.4th at p. 737.) Accordingly, we conclude that the physical injuries claimed by Kalcheim and Panaro raise a possibility that the claim may be covered by the policy. Having concluded that the extrinsic evidence in the form of Kalcheim's deposition testimony raised the possibility of coverage based on the bodily injury arising from her emotional distress from the untrimmed foliage, we need not address Exchange's assertion that "because plaintiffs' neighbors' emotional distress and accompanying physical manifestations flowed from noncovered intangible property losses, their distress is not covered for this additional reason."

Next, we determine whether the "**bodily injury** [was] neither expected nor intended by the **insured**." "[T]he phrase 'neither expected nor intended' focuses coverage on *unexpected* or *accidental injuries* that are fortuitous and not planned or intended. This concept of fortuity is basic to insurance law. [Citation.] Insurance typically is designed to protect against contingent or unknown risks of harm (Ins. Code, §§ 22, 250), not to protect against harm that is certain or expected. [Citation.] In other

17

words, such insurance generally protects against risks of loss rather than certainties of loss." (*Waller*, *supra*, 11 Cal.4th at pp. 16–17.) "[T]he terms 'expected' and 'intended' do not apply to 'unexpected or accidental injuries that are fortuitous and not planned or intended.' [Citation.] Intent and expectation here are judged from the standpoint of the insured, who must subjectively plan the injury or subjectively foresee the injury 'as practically certain.' [Citations.] Thus, injuries that are planned or believed to be substantially certain by the insured are 'intended' or 'expected.'" (*Zelda, Inc. v. Northland Ins. Co.* (1997) 56 Cal.App.4th 1252, 1261.)

Although the Kalcheim complaint alleged that Shelton "negligently" allowed the trees and hedge to grow in violation of Title 22 of the Los Angeles County Code and the CC&R's, and the FAC alleged that plaintiffs acted "intentionally," both the Kalcheim complaint and the FAC alleged that plaintiffs "now consciously" maintain trees and a hedge in excess of five feet and six feet, respectively, in violation of the CC&R's. Exchange contends that the FAC alleged that plaintiffs intentionally allowed the hedge and trees to violate the Los Angeles County Code and the CC&R's. It urges that "[t]he events . . . may not be characterized as accidental . . . [because] plaintiffs refused to take measures which reduced the height of their foliage so as to restore [Kalcheim's] view, improve the safety of the nearby intersection, and restore her driveway's sightlines." According to Exchange, because plaintiffs' refusal to trim the hedge and trees was "obviously intentional conduct . . . [and] Kalcheim's emotional distress was expected after she advised plaintiffs of her daughter's terminal illness and death . . . [p]laintiffs therefore cannot satisfy the requirement of the insuring agreement that their conduct be accidental."

But extrinsic evidence shows that there is a triable issue of fact as to whether plaintiffs intended or expected the bodily injuries asserted by Kalcheim. Shelton declared that she did not foresee that her failure to trim her plants would cause emotional distress and she did not intend to cause distress. In her recorded statement, Shelton stated that neither Kalcheim nor others had ever asked her to cut, trim, or remove the hedge.

18

And Shelton denied knowing if Kalcheim had ever approached her tenants. She declared that the hedge and trees do not create a blind intersection, do not hinder Kalcheim's and George's ingress and egress to their driveways, and the "CC&R's are not applicable, for they only potentially grant a view easement to adjacent properties." In her recorded statement, she also stated that she trimmed the trees every year, and had trimmed the oleanders down to the fence line in July 2010 after receiving a demand letter on July 2, 2010. Accordingly, we conclude that whether plaintiffs intended or expected the bodily injuries asserted by Kalcheim is a triable issue of material fact.

Exchange also contends that the intentional acts exclusion contained in the policy barred coverage. The intentional acts exclusion stated in part, "We do *not* cover **bodily injury, personal injury** or **property damage:** [¶] . . . [¶] 7. Arising from any **occurrence** caused by an intentional act of any **insured person** where the results are reasonably foreseeable." But "[a] policy clause excluding intentional injury . . . is treated as having the same meaning as the language in Insurance Code section 533, which provides that an insurance company is not liable for a loss caused by a willful act of the insured." (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 313–314.) "The purpose of [Insurance Code] section 533 is to discourage willful torts. [Citation.] Indeed, section 533 'reflects a fundamental public policy denying coverage for willful wrongs.' [Citation.] Not all 'intentional' or 'willful' acts within the meaning of traditional tort principles fall within the purview of the statute, however. In particular, a 'wilful act' within the meaning of section 533 means '"something more than the mere intentional doing of an act constituting [ordinary] negligence,"' and appears to be something more than the intentional violation of a statute. For example, intentionally driving an automobile in excess of the statutory maximum speed limit is not 'wilful' within the meaning of section 533. [Citation.]" (*B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 93–94, italics omitted.) Accordingly, plaintiffs' alleged violations of the Los Angeles County Code and the CC&R's, when considered with Shelton's declaration and recorded

19

statement that she did not intend or expect to cause bodily injury, had never been asked by Kalcheim or anyone else to trim the hedge and trees, and believed that the hedge and trees did not obstruct her neighbors' ingress and egress to their driveways or violate the CC&R's, persuade us that Exchange did not establish as a matter of law that this case falls within the intentional injury exclusion of the policy or Insurance Code section 533.

We are not persuaded otherwise by Exchange's citation to *Fire Ins. Exchange v. Superior Court* (2010) 181 Cal.App.4th 388 for the proposition that "[w]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." (*Id.* at p. 392.) In that case, the court interpreted the term "accident" in the phrase "'an accident including exposure to conditions which results during the policy period in . . . property damage.'" (*Ibid.*) It did not analyze, as we do here, a "sudden event . . . *neither expected nor intended* by the **insured**." (Italics added.)

We agree with plaintiffs' argument that an insurer must defend a claim that would be covered if true, even if the claim is in fact groundless. (*Horace Mann Ins. Co. v. Barbara B.*, *supra*, 4 Cal.4th at p. 1086.) Exchange states Kalcheim's and Panaro's illnesses are "far-fetched"; even if true, plaintiffs are still entitled to a defense. In light of our conclusion, we need not address plaintiffs' additional argument that because intent and negligence are not elements of a cause of action for private and public nuisance, the FAC's allegation of intentional acts on the part of plaintiffs were superfluous.

Finally, we deny Exchange's request that, in the event we reverse the judgment, we direct the trial court to enter an order summarily adjudicating plaintiffs' bad faith cause of action in Exchange's favor. "On the insurer's motion for summary judgment, the insured's bad faith claim stands or falls with the merits of [the insurer's] duty to defend. Clearly, the standard for bad faith imposes a heavy burden on the insured, and often requires additional facts outside the insurer's communications with the insured regarding the claim." (*Allstate Ins. Co. v. Vavasour* (1992) 797 F.Supp. 785, 789 [insurer's motion for summary judgment on insured's counterclaim for bad faith denied

20

where insurer had duty to defend trespass; insured entitled to discovery on counterclaim].)  Exchange has failed to demonstrate in its terse and conclusory arguments that a triable issue of material fact does not exist as to plaintiffs' bad faith cause of action and claim for punitive damages.

We reverse the judgment of the trial court.

## DISPOSITION

The judgment is reversed.  Shelton and Sherman are entitled to costs on appeal.


NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


ROTHSCHILD, J.


JOHNSON, J.